

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

**FILED**

James Degorski
Petitioner                                  )
                                            )                    MAR 29 2023 *JK*
                                            )
                                            )              **THOMAS G. BRUTON**
Reg. No. M09414                             )            **CLERK, U.S. DISTRICT COURT**
                                            )       Case Number:
                                            )       _____
                                            )       (Supplied by Clerk of this Court)
      VS.                                   )
                                            )       **1:23-cv-01977**
                                            )       **Judge John J. Tharp, Jr.**
Charles Truitt                              )       **Magistrate Judge Jeffrey Cole**
(Warden, having custody of                  )       **PC12**
petitioner)                                 )       **RANDOM**
REPONDONET, and                             )
                                            )
                                            )
**(Fill in the following blank only         )
if judgement attacked imposes               )
a sentence to commence in the               )
future.)**                                  )
                                            )
                                            )
**ATTORNEY GENERAL OF THE                   )**    Case Number of State Court Conviction:
**STATE OF                                  )**
**n/A                                       )**         02 - CR - 15430
**State where judgement entered)            )**

**PRO-SE PETITION FOR WRIT OF HABEAS CORPUS - PRO-SE PERSON IN STATE CUSTODY**


1. Name and location of court where conviction entered:
   Circuit Court of Cook County-Chicago, IL

2. Date of judgement of conviction:
   October 1, 2009

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)
   7 counts of first degree murder

4. Sentence(s) imposed:
   Life without parole, imposed
   November 4, 2009

1

5. What was your plea? (Check one)  [ x ] Not guilty  [ ] Guilty  [ ] Nolo contendere
   If you pleaded guilty to one count or indictment and not guilty to another count or
   indictment, give details:
   N/A

## PART 1 - TRIAL AND DIRECT REVIEW

1. Kind of trial (check one:)     [ X ] Jury     [ ] Judge only

2. Did you testify at trial?      [ ] Yes   [ X ] No

3. Did you appeal from the conviction or the sentence imposed?   [ X ] Yes

   (A) If you appealed, give the
       (1)  Name of court: Illinois Appellate Court First District
       (2)  Result: Affirmed
       (3)  Date of ruling: October 17, 2013
       (4)  Issues raised: (a) Former State's attorney testified as a sitting Judge. (b) state's
            Attorney/ Judge unsolicited responded he believed Degorski's oral confession to
            be truthful and reliabvle. © Jurors allowed to view zero probative value gruesome
            videotape of victims being stuffed into body bags.
   (B)  If you did not appeal, explain briefly why not: N/A

4. Did you appeal, or seak leave to appeal, to the highest state court?   [ X ] Yes   [ ] No

   (A) If yes, give the
       (1)  Result: Denied
       (2)  Date of ruling: January 19, 2014
       (3)  Issues raised: Former State's Attorney testified he believed Degorski's oral
            confession.

   (B)  If you did not appeal, explain briefly why not: N/A

2
.

5. What was your plea? (Check one)  [x] Not guilty  [ ] Guilty  [ ] Nolo contendere
If you pleaded guilty to one count or indictment and not guilty to another count or
indictment, give details:
N/A

## PART 1 - TRIAL AND DIRECT REVIEW

1. Kind of trial (check one:)  [X] Jury  [ ] Judge only

2. Did you testify at trial?  [ ] Yes  [X] No

3. Did you appeal from the conviction or the sentence imposed?  [X] Yes

   (A) If you appealed, give the
      (1) Name of court: Illinois Appellate Court First District
      (2) Result: Affirmed
      (3) Date of ruling: October 17, 2013
      (4) Issues raised: (a) Former State's attorney testified as a sitting Judge. (b) state's
          Attorney/ Judge unsolicited responded he believed Degorski's oral confession to
          be truthful and reliabvle. © Jurors allowed to view zero probative value gruesome
          videotape of victims being stuffed into body bags.
   (B) If you did not appeal, explain briefly why not: N/A

4. Did you appeal, or seak leave to appeal, to the highest state court?  [X] Yes  [ ] No

   (A) If yes, give the
      (1) Result: Denied
      (2) Date of ruling: January 19, 2014
      (3) Issues raised: Former State's Attorney testified he believed Degorski's oral
          confession.

   (B) If you did not appeal, explain briefly why not: N/A

5. Did you petition the United States Supreme Court for a writ of certiorari?

[x] Yes [ ] No

If yes, give (A) date of petition: April 24, 2014

(B) Date certiorari was denied: October 14, 2014

## PART II - COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filled a post-conviction petition in state court?

[X] Yes [ ] No

With respect to each post-conviction petition give the following information (use additional sheets id necessary):

A. Name of Court: Circuit Court of Cook County

B. Date of Filing: April 14, 2005

C. Issues raised: (a.) Brady Violation - over $100,000 - incentive for both key witnesses to lie withheld from Degorski's jurors. (b.) Ineffective counsel - -over $100,000 incentive for both key witnesses to lie not presented to Degorski's jurors (c.) Ineffective - flailing to investigate and impeach key witnesses' perjury used to wrongfully convict Degorski. (d.) Degorski was not allowed to testify. (e.) Ineffective- failing to object to States Attorney's prejudicial evidence of co-defendant Juan Luna's DNA was recovered at the crime scene.

D. Did you receive an evidentiary hearing on your petition? [ ] Yes [X] No

E. What was the court's ruling? State's Motion to Dismiss was granted

F. Date of court's ruling: January 11, 2018

G. Did you appeal from ruling your petition? [X] Yes [ ] No

H. (a) If yes, (1) was was the result? Affirmed

(2) date of decision: June 13, 2022

(b) If no, explain briefly why not: N/A

3.

1.   Did you appeal, or seek leave to appeal this decision to the highest state court?

   ☒ Yes          ☐ No

   (a)   If yes,   (1) what was the result?        Denied
                   (2) date of decision:           September 28, 2022

   (b)   If no, explain briefly why not:        N/A


2.   With respect to this conviction or sentence, have you filed a petition in a state court using any other form of post-conviction procedure, such as coram nobis or habeas corpus?


   ☐ Yes          ☒ No


A. If yes, give the following information with respect to each preceding (use additional sheets if necessary):
   1. Nature of proceeding    N/A

   2. Date of filed    N/A

   3. Ruling of petition    N/A

   4. Date of ruling    N/A

   5. If you appealed, what was the ruling on the appeal?    N/A

   6. Date of ruling on appeal    N/A

   7. If there was a further appeal, what was the ruling?    N/A

   8. Date of ruling on appeal    N/A

3.  With respect to this conviction or sentence, have you filed a previous habeas corpus in federal court?

    ☐ Yes  ☒ No

    A.If yes, give name of court, case title and case number:  <u>N/A</u>

    B.  Did the court rule on your petition?  If so, state

        (1) Ruling: <u>N/A</u>

        (2) Date:  <u>N/A</u>

4.  With respect to this conviction  or sentence, are there legal proceedings pending in any court, other than this petition?

    ☐ Yes  ☒ No

## PART III - PETITIONER'S CLAIMS

1.  State <u>briefly</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the facts supporting each ground.  You may attach additional pages stating additional grounds and supporting facts.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

### Statement of Facts

# PART III - PETITIONER'S CLAIMS

## Statement of Facts

1. In 2002, petitioner James Degorski and co-defefedanet Juan Luna were charged with the brutal murders of Lynn Ehlenfeldt, Richard Ehlenfeldt, Michael Castrol, Rico Solis, Guadalope Maldonado, Marcus Nellsen, and Thomas Menness who were shot and stabbed to death inside the Brown's Chicken restaurant in Palatine, Illinois on January 8, 1993. (R 7302 - 7660) Their cases were severed, whereas Luna was convicted in 2007, and Degorski convicted in 2009; both received a sentence of natural life imprisonment (C 78-99, R 11089 - 90) before Judge Vincent Gaughan.

## Investigation:

2. A huge investigation ensued. Palatine Police alongside Illinois State Police, and Northern Illinois Police Crime Lab Technicians scoured the crime scene collecting extensive trace evidence including blood, hair, fibers, shoe prints, trash, and more than 200 fingerprints. Investigators noticed the register was reopened at 9:08 P.M. purchasing a 4-piece meal. This was most likely the murderers because it was "dine-in" and after closing time. An eaten meal similar to it was found in a trash can which was collected by techs. (R 6629 - 31)

Sergeant Robert Jacobsen (and others) removed the bodies from the crime scene. He failed to document or at least photograph his actual shoe's impression in the paper for later forensic comparison and exclusion. Jacobsen got blood on his shoes and threw his shoes away (R7727-28) unprofessionally without any documentation of his shoe's tread pattern or size.

Sergeant William King was tasked with collecting fingerprints of the victims at the coroner's office. King missed one fingerprint along with failing to delegate the task to someone who could do this job before the victim was laid to rest. (R 7369 - 7520)

Chief John Koziol forgot to delegate an officer to go to the coroner's office to collect evidence from under a victim's fingernails that fought the robbers, before she was

1

prepared for burial. Her hands were bagged by techs. - again Palatine Police failed to conduct their jobs per protocol.

As part of their investigation, all of the former Brown's Chicken employees were called into the Police station for questioning, one of whom was Juna Luna along with Lockett and other former Brown's employees. On February 17, 1993, Juan Luna was interviewed stating that on January 8, 1993, he worked on cars all day with Jim Degorski, and later that night he went out to party hopping with his girlfriend Eileen Bakalla and their friend Jim Degorski. In the late evening, Juan claimed that he was having sex with his girlfriend Eileen Bakala. This is how Degorsi became entangled in this case.

More than two years later, on November 24, 1995, the Police met with Jim Degorski for the first time to verify Juan Luna's story. Afterwards, Degorski gave Eileen's phone number to Palatine Police Department's William King and a Police Rookie in order to verify the facts of only Eileen and that she was Degorski's friend and not Luna's friend. She also would never have slept with Luna. Upon contacting Eileen Bakalla, she verified that she did not nor had ever dated nor had ever had sex with Juan Luna. Juan and Jim were just friends with her. She told the Police that Juan was lazy and never helped Jim work on cars. Juan Luna would drop off his car at Degorski's house and have Degorski work on the car for him. Eileen never witnessed Luna working on cars ever-not once. King did not take the Rookie Police officer's advice to reinterview Juan Luna that day, so his record was never challenged.

Chief Koziol failed to delegate the task of counting the pieces of chicken (4) before it was sent out, tested, and destroyed. (R8511) Plus, he failed to take both Juan Luna's hand prints during the February 17, 1993, alibi interview.

In September 1998, Tech. Cecelia Doyle of the Illinois State Police Forensic Science Center in Chicago recovered a major and minor mixture profile (a.k.a two DNAs) from some of the chicken and bones recovered from the trash can. (R 6913) In April 2002, Luna's DNA came back a match to one of the DNA samples.
(R 68887-6932) This fact that a DNA was a match to Luna and not to Degorski was not stated in this manner. It was stated as a match for Juan Luna, but was continually used

2

against Degorski because Degaroski's attorneys did not bar it. Thus, making it confusing for Jurors.

In 2002, fingerprint examiner John Onstwedder matched Juan Luna's palm print on a napkin found in the trash. (R7068-7191) It is important to note that Onstwedder completely excluded Degorski from over 200 unmatched prints. (R6696-97, R7138)
Along with Mark Acree, who tried to match Degorski to a partial print in blood on a mopstick the murder used to clean the crime scene, and a print in blood on a bucket found outside by the dumpster left by the fleeing murderers, Degorski was excluded. (R8409-76) Again, Degorski should have been excluded as a suspect at this point.

## VERIFYING JAMES DEGORSKI'S INNOCENCE:

On April 2002, James Degorski voluntarily provided ten mouth swabs and whole entire hand prints (R 7404) to verify his own alibi since "everyone is suspect" and they have the two murderers' DNA, prints, and eyewitnesses. While being interviewed/ interrogated on May 16, 2002, hair follicle DNA samples were taken from James Degorski's scalp. Once again, Degorski was cleared of the second DNA found on the eaten pieces of chicken found with Juan's eaten pieces of chicken that were found at the scene of the crime. Degorski's attorney read a quick stipulation to the Jurors. Most people missed this including the press and Degorski's family. He stated, "Tech. Jan Johnson excluded Degorski as a contributor of the second DNA recovered on pieces of eaten chicken." (R8733/ 8907) In fact, no trace evidence at all linked James Degorski to this crime. Experts in person should've testified to this with no confusing jargon so everyone could have understood.

In June 2022, Illinois Appellate Judges missed the argument of the "second DNA" and "Second DNA didn't match Degorski" when they based part of their decision on a DNA match of Luna and Degorski being with Luna later that night." (See P. 72, 11, 24, 74, 76) as if this means Degorski is guilty because he partied with him later that night.

3

One of these false witnesses was Anne Lockett England, who testified that since 1990, she had been close friends with Degorski and was at his home daily. She claimed she dated him in December 1992, and moved into his mother's home on the evening of January 26, 1993. (R 7529) Ineffective Counsel failed to easily discredit this-like asking Tracy Gavrillos, now Sheriff Bailiff in Cook County Courthouse, about Anne's psychiatric lockup from September to November 1992. Lockettt was confined to a psychiatric unit as a minor following a suicide attempt. In early January 1993, Lockett was readmitted to the psychiatric hospital a second time. While under suicide watch the evening of January 9, 1993, Lockett claimed that she received a phone call from Degorski from a pay phone. She claimed that Degorski told her to watch the news as he had "done something big." Lockett claimed she went to the dayroom to watch the news about the Brown's Chicken Murders. (R7536-37)

This supposed confession phone call is an impossibility as Degorski proved in his post-conviction petition including an exhibit of Carrie Walsh. (See Appendix Exhibit 1, A1) Ms. Walsh was Lockett's January 9, 1993, psychiatric hospital's roomate. She recalled Lockett being on a 72-hour suicide watch upon being admitted. Lockett did not have access to the phone as it was not allowed. (R 7536-37)

James Degorski's post-petition also proved Degorski wasn't even dating Lockett at the time of this supposed phone call. Richard Billik proves he was in fact her boyfriend from November 1992, through March 1993. (See Exhibit 2, A3) This completely calls into question Lockett's whole story of "Dating Degorski December 1992" to validate why Degorski would call Lockett at the hospital to confess, and why she would rush to Degorski after her discharge.

Mr. Billik most certainly calls into question her discharge story on January 25, 1993. Lockett claimed that after her discharge she went straight to Degorski's home where Degorski and Luna confessed to the Brown's Chicken murderers and gave her all of the details while sitting in that "tiny bedroom" in the basement. She goes on and further lies that she moved into the Degorski home later that night "taking the relationship to the next

4

level."  (R7538-39) Bilik completely refutes all this along with Lockett's incriminating story of living at Degorski's home on February 17, 1993, when she was supposedly told by Degorski to go with Luna and "make him look good at the former "Brown's employee interviews." (R7543-46)

Degorski's post-petition affidavit from his mother (see Exhibit 3, A6) further destroying Lockett's claims dragging Degorski into this crime with Luna-her friend at this time and it is important to note that Luna is not a friend of Degorski's at this time. Lockett claimed that Degorski's "tiny bedroom". However, that "tiny bedroom" didn't exist in 1993. It had been remodeled in the summer of 1992, due to the basement flooding and Degorski had been dating Tracy and not Anne. So, there was no validity to her statement that Degorski and Luna confessed to the Brown's Chicken murders in the tiny room in the basement in 1993.

In late1993, Lockett called Billik asking him if he had anything to do with the Brown's Chicken murders. (see Exhibit 2, A3)  Interesting!  This further proves that Degorski had not confessed to Lockett in January 1993, as she was still wondering who had done the crime in late 1993.

It just goes to show that Lockett was very interested in the reward money back in 1993.  In contrast, under oath in 2005, during the deposition she lied claiming she didn't know anything about the reward money.  More misconceptions around this money occurred when Lockett's best friend Melissa Benz Oberly Ippach who received a portion of the reward money in 2010, (See Exhibit 4, A8) announced in 2002, she felt that Lockett should have received the reward money in a Daily Herald interview (See Exhibit 5, A10) Now there is a provable timeline.  Counsel could have used this information to discredit her.  Again, ineffective Counsel.

Degorski's post petition proved Degorsk's Jurors should have been made known about the witness's knowledge about the reward money.  As it turned out, Lockett and Ippach divided the reward money (See Exhibit 4, A8) each receiving $49,064.50 after Degorski's conviction in 2010, not two years earlier after Lockett's testimony already led to a conviction of Luna in 2007, when the money should have been awarded as promised

"upon a conviction."

Lockett's testimony was based on greed, lies, and hatred of Degorski who broke a relationship with her in August of 1994. She later became enraged on an unfortunate phone call made by Degorski in 2000, when he called her to kindly offer to return some old photographs to her and commence in some idle conversation which led to news about Degorski's upcoming nuptials to a women with whom Lockett had hated. This caused Lockett to become enraged.

Before Degorski's arrest in March 2002, Lockett had Melissa Benz Oberly Ippach call her friends in the Palatine Police Department to turn-in Juan Luna and James Degorski for the Brown's Chicken murders. (See Exhibit 5, A10) This sheds massive doubt about King (R 7369-7520) Koziol's (R 8511-8530) testimonies of not knowing of Lockett or Ippach before 2002. Why wasn't this all disclosed during the trial by Degorski's attorney? Ineffective Counsel!

Interestingly dragging Degorski into this crime with Luna, Lockett concocted so many lies in her many meetings with Law Enforcement that before the Grand Jury hearing Lockett couldn't keep her story straight. Lockett was a college educated person, but oddly needed to read her testimony to the Grand Jury instead of the typical "ask/ answer" format. Lockett's perjury should have been easily impeached pretrial, and she shouldn't have been allowed to be a witness against Degorski.

## EILEEN BAKALLA:

Eillen Bakalla was another false witness against Degorski in his trial. Bakalla was also incentivised by the $100,000 reward money to also convict Degorski, two years after her testimony already led to the conviction of Luna, Degorski's co defendant.

Judge Gaughan warned Degorski's Jurors that Bakalla was receiving immunity from Police and committed no crime at all related to this case. (R 6981; 6984-85)

Bakalla's time card at the Hoffman Estates Jake's Pizza Pub proved that she got off of work early at 9:30 P.M. January 8, 1993, (R 6988-89) after Degorski called her at work to tell her he had "done something big" and (R 6950) demanding she meet him at the

6

Carpentersville, IL Jewel Osco; very close to where Bakalla was house and cat sitting for her friend in Elgin, IL while they were away in Florida. Brown's was robbed between 9:08 PM and 10:48 PM. (See State's Trial Exhibit 55) This call to Bakalla that she claimed Degorski had made must have come from inside the Brown's Chicken restaurant during the murders if it was made at that time. Chief Koziol failed to support this incriminating phone call by using Brown's Chicken phone records from that evening. Why didn't Degorski's attorney refudiate this phone call as well?

During Luna's trial, Bakalla lied that she got out of her car at the Carpentersville Jewel/ Osco. This served no purpose except to lie and state that she had seen a bloody rubber glove somewhere in Luna's car. (See Luna's Trial April 17, 2007, pg. 75:6-77:14)

However, knowing there was no purpose to get out of her car for Degorski to get in from driving around in Luna's car to see if his repairs from the day were good and Luna getting in from an unknown car that no one had ever seen before to get in, she messed up her lie not recalling where she had supposedly seen the bloody glove in Luna's car because he hadn't come from his own car. Bakalla admitted in Degorski's trial she probably never got out of her car at Jewel, nor did she see any bloody gloves (See Degorski's trial September 2, 2009, pgs 19 & 24: 20-22; 60: 18-64; 3) Most likely, Bakalla came clean despite a lot of state's "leading" questions. (Side bar R 6957 & 6959) King, Lockett, and Bakalla claimed "On the way to Jewel/ Osco, Degorski and Luna tossed their bloody shoes, clothes, and coats into garbage dumpsters. (R7542; R7966.) Why would bloody gloves still be left in Luna's care then?

During Luna's trial, Bakalla lied that Degorski and Luna counted the robbery money on the floor of the friend's townhome. (See Luna's trial April 17, 2007 pg 81:14-82:8) Then, during Degorski's trial she changed her story to "they counted the money in one of the upstairs bedrooms." (See Degorski's trial September 2, 2009, pgs 26: 22-27 & 21) There was no robbery money counting at the townhome.

Balkalla testified that Degorski gave her $50.00 that he owed to her out of the robbery money. (R6961) Locket and Officer Stoecke testify that Degorski refused $181.00 from a victim telling him to "put that fucken' money back into your pocket and get in the

7

back." (R7959-60; R7420-21) Stoeckel validated this story and testified to collecting the $181.00 cash from a victim's pocket (R7195-7204) King and Locket testify that Degorski never needed money and that this story corroborated this. So, just because money was found in a victim's pocket, this is what one would conclude about what the murder said and did that night?

Bakalla goes on to effectively lie unimpeded by Defense Counsel stating after partying from her friend's townhome for a few hours, she drove Degorski home between 1 and 2 AM on the morning of January 9, 1993. She stated that on the way home she drove Degorski past Brown's where Degorski alone confessed to her seeing ambulances and Police cars. (R6964; R7965) First, this is a lie because the Police state the murders weren't discovered until after 3:00 A.M. (R6557.) So, how could there have been an ambulance and Police cars there between 1 and 2:00A.M. when she claimed she drove Degorski past Brown's? Second, the Palatine Brown's Chicken restaurant would not have been on the way home, but would have been about a ten mile out-of-the way trip. Friends that have been drinking and smoking do not take "out-of-the way" paths to get to where they are going. (Exhibit 42 map) Counsel could have been used to effectively prove this point, but failed to do so. Third, Bakall was cat-sitting a few very hyper cats for her friends and wasn't about to leave them. The fact remains that Bakalla only drove Degorski and Luna to the Carpentersville Jewel/ Osco and Juan Luna drove Degorski home that night in his own car that Degorski had driven around in to make sure the repairs Degorski had done were done correctly. Degorski was not about to spend the night at the townhome either as he is allergic to cats and Luna had a 1:00 AM curfew. (R6966, 7000.) Luna drove Degorski home using the shortest route possible. (R6962) So, there was no out-of-the-way drive by the Brown's Chicken restaurant and no confession.

After many interviews with Law Enforcement they concocted a highly incriminating lie about Degorski taking Luna's car to an outdoor coin operated car wash on January 9, 1993, to pressure wash and vacuum Luna's red interior and spray off the entire outside in an attempt to destroy blood evidence while Bakalla stood there watching Degorski. (R6966-68) First, the problem with this lie is that Officer Stoeckel (R7195-7204) and Nami

8

Bhowmik (R8561-8607) testified it was 20-28 degrees on January 9, 1993, water freezes at 32 degrees fahrenheit. So, Degorski would not have been out there washing the car in that temperature as he used to be a professional car detailer. Furthermore, while creating this story, neither Bakala nor Palatine Police knew Degorski still had access to the auto detailing shop he used to work at a year earlier. So, why would Degorski use a different and an outdoor facility? Mark Mogilinski owner of MJM Auto Polishing testified that Degorski had 24/7 access to his heated and fully stocked shop as a former and trusted employee from 1992-2002. Mogilinski went on to testify what would happen to a car's locks, windows, doors, and electronics if you pressure wash outside in those temperatures as Bakalla described. (R8323-8360)

So, again, just like Anne Lockett, (the other key witness) Bakalla's lies dragged Degorski into this heinous crime when she should have been impeached pretrial. Jurors became confused by her lies which led to an unfair trial which led to an unfair and wrongful conviction of James Degorski.

**Law Enforcement:**

Degorski had been living in Indianapolis, Indiana since March 2001. He was obviously unconstitutionally arrested at 3:30PM on May 16, 2002, in Zionsville, Indiana in his work parking lot. On that day, a team of Palatine Police Officers from Illinois had been trailing Degorski for a week. They joined forces with Detectives Dan Briscoe and William King without a warrant, along with two teams of observers from Hamilton County Indiana Sheriff's Department and Indiana State Police that swarmed and surrounded Degorski at his work parking lot while he was moving his tools after finishing work for the day.

With all of Law Enforcement present, Degorski was told to turn around and put his hands on his truck. (R7400) Obviously under arrest, he was not allowed to do anything-not even drive himself to Palatine, Illinois for further questioning, and no warrant was provided.

Hamilton County Sheriff's Investigator Kerry Milligan (6'1'; 200lbs.) testified at Degorski's Quash/Suppress Motion Hearing a month before King that one of the

responders of the dispatcher's report (see Exhibit 6 A13) for serving an arrest warrant for murder was to observe and make sure no rights were violated. Milligan effectively lied that Degorski's truck's tailgate was down and Degorski was less than six feet away. He did not observe any arrest (frisk) of Degorski. (See August 31, 2007, of opening arguments/ Milligan/ Dett. B. Killacky is missing from the Common Law Record. See also Degorski Quash August 31, 2007, pg. 32: 2-6.) King (who lied) is a Sergeant that should know the protocol for "picking up/ arresting/ questioning/ taking into custody" a murder suspect. Then, Briscoe lied that he patted Degorski's waist only to be sure that he wasn't carrying any weapons in a "right-to-carry a concealed weapon" state! (R 2972-3012 *See also Degorski Quash September 20, 2007, pg 137: 18-24 & 182: 19-22) Brotherhood "Code of Silence." These lies are obviously covering up an illegal arrest with no integrity under oath in a Courtroom before a judge proved that this was in fact an illegal arrest of Mr. Degorski. This also proves that Counsel was ineffective at pointing out his obvious situation. None of the Indiana Law Enforcement teams, Milligan, Lieutenant Roberts, Homicide Unit Lieutenant Gibbs, nor Trooper Minnikus would later sign King's scribbled notepad as a "pick-up of Degorski as a witness for a murder case" as they witnessed his arrest. (See exhibit 7 A14) Degorski reluctantly signed this notepad in the back of the Police car after the chaos had ensued in the parking lot at his work site and his unlawful arrest. He was forced to sign under duress to just get away from all of the attention this scene had unjustly created for him. He asked to retrieve his inhaler for his asthma and was denied. All of his rights were denied as he was unlawfully arrested and not picked-up. Degorski was not allowed to use the bathroom, phone, get a much needed inhaler, or speak to a lawyer. Degorski was obviously unlawfully arrested, and this was covered-up in the Courts. (See Exhibit 8, A15)

The underoath lies continued where Mr. King testified to needing to get out of the car to ask for directions because he and Briscoe were "completely lost" and needed directions on how to return back to Interstate 465. (Exhibit 7) Then, Milligan goes on to testify that the directions were so complicated that he, King, Koziol, Molttale, and others commented on Degorski's complete cooperation and willingness to assist them with directions just like

10

he had been so compliant one month earlier when Degorski escorted them around Palatine. Why would a supposed loser/ murder be so compliant and nice?

The post petition was clear. Degorski shouldn't have been allowed to support/ validate the arguments in the Quash/ suppress motion-the facts in the motion couldn't have been verified unless Degorski testified leaving the motion ineffectively moot. When Degorski was told he would be allowed to testify, but then tricked into never actually being allowed to do so at his own Quash/ Suppress Hearing, this proved again ineffective Counsel. It is clear by the Court Record alone that there was always the intention by the Palatine Police Department of Illinois to arrest James Degorski and frame him for the murders of the people that owned and worked at Brown's Chicken in Palatine, Illinois.

Palatine Police Chief John Koziol made a mockery of the Courts when he lied and tried to rationalize why he made the decision to isolate Degorski at a Police station in Streamwood rather than at the Palatine station. He claimed that the Palatine Police station had "parabolic mics" and "satellite microphones." Was he trying to hide his secret narrative from others? Why stage Degorski at another station-this is suspicious activity. (R2904-27 *See also Sept. 2007, pg. 56: 1-58 & 6)

The Police coerced a false confession from Degorski through constant threats instilling fear, use of harassment, creating sleep deprivation, and making sure to extend this cruelty over two days straight. They recorded on videotape the sections that they wanted to use and stopped during the parts where Degorski's statements didn't fit their narrative. This is an illegal use of Degorski's statements. A supposed videotaped coerced confession that was taped over two days was edited down into a 4 minute and 32 second streamlined take. How is this even admissible in the Court? (See November 7, 2007, Impounded State's Exhibit 5 & 6) This video clearly shows Police and ASA were lying to the Court. They claimed absolute hospitality and rest during interrogation. The video clearly showed they did not. It showed Degorski waking up after an 8 hour slumber, and Degorski appeared to be exhausted and was clearly suffering from a dangerous episode of an asthma attack. (R7967-70) Just as Degorski had claimed and should have been allowed to take his inhaler when he asked upon his unlawful arrest.

11

Degorski had to then be taken to Northwest Community hospital on May 18, 2002, to receive an Abuteral breathing treatment in the emergency room. Dr. Pamala Laesch stipulated on September 20, 2007, (Quash pg. 189 Hearing) that Degorski complained of wheezing and suffocating since noon and had to endure 13 hours of it before Police transported him to receive emergency services. (R3039) Degorski was then returned to the Palatine Police station for additional "torture/ coercion of confession" in order to just use the phone.

## THE TRIAL:

At the trial, Jon Simonek (R8219-8243) and Mrs. Casey Sanders-Haefs (R8361-8402) testified on behalf of Degorski (they both refused to testify for Luna) stating that they were terrorized by Palatine Police repeatedly to agree to falsely confess to being the murders at Brown's using as many details that were never released to the public that only the murderers would know.

Although their fingerprints and DNAs were completely excluded; police obviously fed them these details unprofessionally trying to solve the case. Equally important is after a 36 hour interrogation Eileen Bakalla (R6981-84 falsely implicated others as Luna, Simonek, and sanders-Haefs did. Though completely relevant to this case at hand, at trial Mrs. Sanders-Haefs was barred from telling Degorski's Jurors that despite being appointed counsel Margaret Domin in open court pretrial (R6379-6457) that last night the Palatine Police showed up at her Crystal Lake home waking up her family, getting her out of bed, refusing to leave, questioning her about if she is going to testify for Degorski tomorrow-exposing their torturous act of getting her and Simonek to falsely confess to a horrid crime that they had no part of and without any respect to the fact that Sanders-Haefs was a former employee of Brown's and a real survivor with her own guilt-they violated her First Amendment right of allowing the Jurors to hear what the Police had just done to her the night previous and have it documented. Again, this proves that the Palatine Police department were eager to solve this case. They knew that they had the DNA of one murder Juan Luna, but they needed that second murder. At this point,

12

anyone would do. King slips up during his testimony of why he would need hours and hours of all day and night and into the next day and night of questioning Degorski with many moments of silence and staring at the wall and somehow Degorski's alleged confession fits into a 4min and 32 second video? All of the Law enforcement Officers that testified did express how Degorski was always cooperative and compliant. (R 7369-7520 See also September 8, 2009 pg. 75: 15 & 87: 8 & 14) This coercive action over time under duress to gain a "confession" was exactly what Mr. Degorski had been claiming since it happened.

Right along these same lines, the last 3 minutes of the supposed confession video tape shows an illegal manipulation of repetitive "cooperate or else" jabs. The Palatine Police/ ASA McHale weren't really going to just leave Degorski in Streamwood's Police Station all alone, they were just setting him up. "We're walking out…Do you want us to leave?…I'm walking out...Is that what you want us to do?" This was all to get DEgorski to admit to this horrific crime that he did not commit in order to have the video stopped or to use the phone. In fact, the "video stopping" or "use of phone" offer stood as the interrogation continued as they held Degorski for another 16 hours without being charged; without seeing a Judge.

That 4 minute video (See November 7, 2007 impounded State's Exhibit 5 & 6) clearly shows Police/ ASA were lying. They claimed they gave Degorski hospitality by offering him food, drink, and rest. However, after an 8 hour nap, Degorski looked exhausted, was short of breath, was suffocating from asthma due to an allergy attack-exactly as he had been claiming upon his unlawful arrest that he would need his inhaler. (R79767-70) In Palatine custody 1A.M. on May 18, 2002, Degorski was taken to Northwest Community Hospital where he received an Abuterol breathing treatment on the way and in the emergency room. Dr. Pamela Laesch stipulated on September 20, 2007, Quash (pg. 189) hearing that "Degorski complained of wheezing since noon" over 13 hours of suffocating as seen on the 4 min. videotape. (R 3039) After treatment, Degorski was brought back to the Palatine Police station for an additional 7 hours of "questioning/ torture" to finish the video in order to finally use the phone.

13

**ASSISTANT STATE'S ATTORNEY (ASA) MCHALE:**

All of Degorski's Jurors admitted to knowing about Degorski's case from all of the news coverage from the morning of the murders and from Luna's trial and conviction. (R 3793-6369) One of the Jurors was J-1 who had been researching this case since 1993, and had a Facebook page friend in the State's Attorney Office (R 5955-6067 pg84) In fact, J-2 is a Police Lieutenant (R 5955-6067 pg.299) and J-5 is a Correctional Sheriff Degorski's jail (R4950-5088 pg49) and is being sued by an inmate for excessive force as is Degoski suing a correctional officer for use of excessive force regarding broken bone to his face. Instead of removing them from the Jury pool with cause, the Court actually instructed them to listen to evidence and be fair (8-28-09) before Degorski's trial started. This is a prejudiced Jury-how is this right to a fair trial by your peers?

During the trial, ASA McHale (R 7946-70) was serving as a Cook County Judge in Chicago. He was allowed to be introduced as a sitting judge. He was borderline hostile during the cross examination of McHale and barked back "counsel" at Degorski's public defender eleven times which flustered her as if he was sitting on the bench instead of on the stand. This situation clearly caused a complicated and uncomfortable outcome during this section of Degorski's trial. The Jurors were completely confused as they gave more weight to Law Enforcement's testimony due to the way Moltale conducted himself during his testimony telling him to "take care" at the end of his testimony. The Court didn't offer this farewell statement to other witnesses. Just because someone is of a high-ranking position should not grant them special treatment when giving testimony in a Court of law. This shows that their statements are favored and/ or are considered truthful.

McHale took the stand and stated that he never listened nor looked into the interview room through the one-way mirror while Degorski was being interviewed. When McHale woke from his 9:00PM-4:00AM nap, (R7954-56) he met King in the hallway and claimed Degoski was giving much better crime details. King never discussed if or what reports, photographs, etc. King or Briscoe showed Degorski while he was napping.

This case has been contaminated with unreliable false confessions from multiple people who tried to support their narrative with evidence that could not have been proven because

14

one who could corroborate was napping at the time. (R 8008-12)

Case: 1:23-cv-01977 Document #: 1 Filed: 03/29/23 Page 21 of 100 PageID #:121

The Court made it mandatory on October 31, 2005, to turn over all evidence before depositions were done-including and "field notes." McHale was deposed on April 5, 2005. So, by the time he was to turn-in his notes as evidence in 2007, he had doctored them to match the narrative. All evidence should have been turned over shortly after Degorski's arrest to prevent these types of incidents. He even received more favoritism during Degorski's trial from the Jurors by being allowed to use his "notes from that day." This led to a false testimony which Jurors were unaware.

After McHale testified, he requested the rendering made by the Court's artist of himself while he was testifying against Degorski as a keepsake. (Degorski trial September 14, 2009. Hallway Officer Walker) This further displays the level of emotional interest MsHale invested into the conviction of Degorski. He would do whatever it took like lie under oath and break Court laws just to get Degorski convicted.

## COWORKER WALTER HANGER:

On April 2002, Degorski's coworker was allowed to testify and misinform Jurors that Degorski asked him if a murderer can still go to Heaven-which was an absolute lie. In a sidebar (R 7871) Degorski's lawyer asked the Court to block this statement. This was granted. The real story was when Hanger first started work he was preaching about saved and unsaved people with a testimonial of D.C.F.S. and how they were not allowing him visitations with his daughter. He also told Degorski that his brother had been saved after a term in prison for molesting his own children. Degorski replied to Hanger that God allows serial rapists into Heaven while quoting Bible verses in a heckling smart-alik way that people often misunderstand. Degorski has been saved since 1991, by attending Son City youth group at Willow Creek Community Church. Which again was withheld from Jurors and would have proved Degorski is not nor ever was a murder. (R7864-76)

15

**NURSE ALESIA HINES:**

At the trial, the state called Cook County Jail Nurse Alesia Hines (R7879-7940) to the stand. She lied and told the Jurors that Degorski confessed to her about the Brown's Chicken murders while she was cleaning and dressing Degorski's wounds on his lip (R7890-91) However, photographs taken 20 minutes later in Cermack Hospital prove that she was lying about the lip wound as it was not clean nor dressed it was crusty with dried blood. No ointment or dressing had been applied. (See exhibit 90 & 91 photographs) Degorski's injuries also shed light on the Hines lies. Degorski suffered at the hands of a Correctional Officer an unjustly, unlawfully, and severe beating causing a broken jaw, shattered tooth, dislodged front tooth, ¼ inch gash in his lip, broken nose, and a crushed eye socket. (See Defense Exhibit 90 7 91 photographs) Furthermore, Lieutenant William Thomas had enough integrity to testify that he was on duty that day. Degorski was never more than 6 feet away from him and would even escort Degorski to and from places within the jail which provided a close enough range to hear all that was said or not said. Nothing was ever said that entire morning about the Brown's Chicken murders. (R8476-99) Notably Hines never mentions this in any reports nor to any coworkers under "strange occurrences" as one is supposed to record such occurrences. In fact, she doesn't make any reports for almost two years, until asked to testify at a different trial (R 2863-99) Then, out of great concern for herself, Degorski's ineffective council promised her that he would have rebuttal witnesses admonished so no need for her to worry about being exposed for filing false Police reports stating that her Mercedes-Benz was stolen when it was not just to receive insurance money. This would have been the best information for Degorski's counsel to use to discredit this witness. Isn't that his job? He allowed her testimony to sit in the minds of those impressionable Jurors-ineffective counsel.

## DEGORSKI'S TESTIMONIAL:

Degorski was set to testify on August 18, 2005. On an unrelated Civil Deposition, Degorski's attorneys stopped him from testifying to preserve it for his trial. Degorski was again denied his right to testify during his 2007, Quash Illegal Arrest/ Suppress False

16

Statements, Supposed Quotes of Degorski Hearing. Again, it was told to Degorski as a way to preserve his testimony for trial. Then, in 2009, Degorski was denied testifying again at trial. Degorski was set to easily refute all the false claims against him with evidence, but was tricked into waiting until the final day by his attorney Mark Leveitt. The trial ended and Mark didn't even ask the Court to allow Degorski his right to take the stand.

## APPEALS:

Based on the Court record, "Statement of Facts" the witnesses against Degorski contradicted each other, evidence, and even common sense. It was obvious that Degorski did not receive a fair trial and was not awarded competent Counsel. The lies and framework that were told to the Jurors have put Degorki into the prison system as an innocent man for over nineteen years.

In the Appellate Courts the same falsified evidence that was used to wrongfully convict Degorski was used to deny his right to another trial. It is really unfathomable that a Judge would fail to look beyond what was presented the first time. If a defendant is appealing his/ her case there just might be a good reason why. Perhaps there really was negligence or framing or fraud. That is why we have the Appellate Court in the first place. Even listening to the Judges at Degorski's Oral Arguments in 2022, they failed to really hear the most exonerating point in the case - Mr. James Degorski's DNA does not match either of the two samples collected from the crime scene. Juan Luna is a match and the other is unknown. That right there should set this man free.

17

**(A) Ground one:**

Petitioner was denied his constitutional right to a fair and impartial Jury trial, equal protection, and due process of the law as guaranteed under the Fifth and Fourteenth Amendments of the United States' Constitution where the State violated Brady vs. Maryland by failing to provide evidence that both key witnesses E. Bakalla and A. Lockett had a financial incentive to lie against Degorski.

**(A) Ground one**
**Supporting Facts:**

Mere weeks after the 1993 Brown's Chicken murders, the Village of Palatine set up over $100,000 reward fund for "Information Leading to the Convocation of the Perpetrator." Despite the infamy of the crime and public pressure to solve it, no charges were brought until Petitioner and Codefendent were charged in 2002, after Eileen Bakalla and Anne Lockette came forward with the information that allegedly Mr. Degorski and Juan Luna had confessed to them nearly 10 years earlier. Petitioner was convicted on the testimony of these two witnesses, and on the testimonies of the ASA McHale and Commander King that he had made an unrecorded oral confession to them after his arrest in 2002. The prosecution did not disclose, and the Jury did not hear during the trial, that Bakalla and Lockett had been named as the possible recipients of the reward money if their testimony led to a conviction, and Lockett had been promised she would receive it.

In this post-conviction petition, Petitioner asserted that the State had violated his right to due process rights under Brady v. Maryland by not disclosing that Bakalla and Lockett had a financial motive to secure his conviction. When pledgers heard that Bakalla and Lockett might get the reward money they wouldn't match the fund, which was much higher. (C.4424-34) The evidence attached to Mr. Degorski's petition included a Daily Herald article titled "Who might be in line for reward in helping solve Brown's case," in which Anne Lockett and Eileen Bakalla were named as possible recipients of the then $85,000 of reward money. The article stated, "Palatine officials stressed that the reward money is contingent on a conviction, and no decision will be made until after trial." In

18

another article offered in the Chicago Tribune, prosecutors called Lockett a "hero" for telling her story. Mr. Degorski further attached evidence that Lockett eventually received almost $50,000 of reward money. (C. 4424-34) Mr. Degorski alleged that Lockett was assured by Palatine's Police Chief Koziol that "if she testified well and her testimony secured a conviction, she would receive the money." (C. 4401) In fact, Bakalla and Lockett should've received the money when their testimony led to the conviction of Luna in 2007, two years before Degorski went to trial. More importantly, Police left the reward money on the table until Degorski was convicted too; which wasn't the public agreement. (See Exhibit 9 A18)

Despite the trial counsel's specific request that the State tender any information related to whether witnesses had "been promised anything, including pay...in exchange for testimony," and the State's statutory obligation to disclose that information, the State did not tell the defense of that public reward money. The appellate Court agreed that Petitioner "made a substantial showing that the evidence of Lockett's monetary motive to testify" was favorable impeachment evidence that the State failed to disclose. (Degorski, 2002 IL 180192-U, P. 39 See Exhibit A 24-48) However, the Court ultimately rejected Brady claim on the basis that "evidence of Lockett's monetary motive would not have been material to Degorski's Trial." (Id. at P. 48.) Incredibly, it later went so far as to say that even if the Jury had completely disregarded the testimony of both Lockett and Bakalla, the outcome of the trial would not have been different. (Id at p 49.)

Under the standard for maturity applied by the Appellate Court—"a reasonable probability that, had evidence been disclosed to the defense, the result of the proceedings would have been different"— the withheld $100,000 motive was material because the testimony of the two incentivised civilian witnesses was the bulk of the State's case against Petitioner. The appellate Court erred by failing to consider the importance of Bakalla and Lockett's testimony when weighed against the remainder of the prosecution's case where it applies to Degorski and the reward money when combined with the other attacks on their credibility.

Brady's materiality standard...required the Court to gauge the potential effects on the

outcome of the trial if the concealed information had been available to the defendant. Courts must consider "the overall strength of the prosecution case, the importance of these particular witnesses' credibility to the prosecution case, the strength of the concealed impeachment material, and how the concealed material compared to the other attacks the defense was able to make on these witnesses' credibility. (Id. citing Giglio, 405.) While the Court below made a conclusory statement that Bakalla and Lockett's testimony would not have changed the outcome because of the Police and ASA testimony, its opinion does not consider the weakness in that testimony or all the other impeachment evidence presented at trial.

The Court below twice relied on the fact that Officer King and ASA McHale testified that Petitioner made an oral confession to them in rejecting the materiality of the $100.000 reward money. (Degorski, 2022 IL 180192-U PP47, 49.) But it did not consider that Mr. Degorski's unrecorded oral statement was seriously called into question by two witnesses Haefs and Simonek who testified of this Police department's patterns of practice using unconstitutional manipulation and coercion to pressure them into making false statements about crime— one of them into confessing guilt and both into implicating her boyfriend Todd Wakfield all proven innocent. Casey Sanders Haefs testified that for 7 or 8 years she was repeatedly interviewed about the Brown's murders by Law Enforcement, who contacted her work, spoke to her friends, roommates, and husband, and became "nastier and nastier." (R. 8266-70) In 1999, Police picked her up from work, held her from 6:00pm to 2:00am with no food, and told her that a nightmare she had about a crime was actually what happened, and she would go home if she stopped telling them it was just a dream. Like Bakalla's 36 hour interrogation, Haefs eventually made up a story implicating her former boyfriend. This level of official misconduct and corruption should call into question the reliability of all their testimony, claims, quotes, and patterns of bad practices are obvious here and related to this case.

Jonathan Simonek testified that he had eventually made a statement implicating himself and Wakefield after Police took him into custody and wouldn't let him leave until he told them what they wanted to hear. (R. 8225-33) Despite insisting that he was innocent

20

and had no knowledge of the murders, Simoneck wrote out and signed a confession form and gave a videotaped confession using many crime details never released to the public. (R. 8238-39, 8194.) In light of Simonek's and Haefs testimony, which revealed terrifying psychological torture coercion tactics by Police to fabricate evidence, the testimony of King and McHale supposedly quoting Degorski claiming he made an oral confession was of questionable value, leaving no doubt that the testimonies of Bakalla and Lockett were of central importance to the verdict.

A motive for the dishonest to the tune of $100,000 is material impeachment evidence. There is "danger" in promising a witness money in exchange for testimony because "the sheer size of the possible bonus—upwards of $100.000" can create an incentive for witnesses to perjure themselves. In this case, the witnesses obviously did. Mr. Degorski's defense was built around discrediting Lockett and Bakalla's testimony—it impeached Bakalla and failing memory due to former drug use (the fact that she was facing charges and was given full immunity for an unrelated crime, and an auto detailing expert Mark Mogilinski witness proving that she lied about destroying evidence by washing the inside and outside of a car at an outdoor car wash. Appellate attorneys discredit all three of Lockett's confession stories implicating Degorski. Lockett somewhat with her former drug use and mental health issues. Moreover, Bakalla and Lockett's explanation for waiting to tell Police for nearly a decade to report to the authorities the identities of the perpetrators despite the infamy of the crime was suspect. This caused doubt on the truth of these witness testimony. Given the strength of the impeachment evidence and the other patterns of practice weakness in the State's case, it is clear that the Court below did not truly "gauge the potential effects on the outcome of the trial if concealed information had been available." Accordingly, James Degorski humbly asks that the Court please issue a conditional Writ of Habeas Corpus ordering Illinois Court to either release him or afford him a new and fair trial under your supervision, and within your demanded specific period of time. (Degorski, 2022 IL 180192 P. 39 See Exhibit 11 A 24-46)

**(B) Ground two:**

Petitioner was denied his constitutional right to a fair trial, effective assistance of Counsel for defense, equal protection and due process of the law as guaranteed under the Sixth and Fourteenth Amendments of the United States' Constitution where trial counsel failed to investigate and simply uncover evidence that both key witnesses E. Bakalla and A. Lockett had a large financial incentive to lie against Degorski at trial.

**(B) Ground two**
**Supporting Facts:**

Mr. Degorski's petition also alleged that his trial attorney was ineffective for not impeaching Lockett and Bakalla with their financial incentive. (C. 4404-6) To merit an evidentiary hearing on an ineffective assistance of counsel claim, the defendant must make a substantial showing that Counsel's performance was defiant, and that Counsel's defiant performance prejudiced the defendant. The test for deficient performance is not whether a different verdict would have certainly have been rendered, but whether the petitioners has made a substantial showing that Counsel's performance undermined confidence in the outcome of the trial, although Degorski has shown both; it is obvious the outcome of the trial would've had a different verdict had Counsel not been neglectful and ineffective.

Mr. Degorski had made a substantial showing that Counsel's failure to impeach Lockett and Bakalla with their financial incentive to implicate him was both professionally unreasonable and highly prejudicial. Any reasonably competent defense attorney would have been aware of the witnesses' financial incentive in this case and present the facts to the Jurors for their client; the most minimal investigation would have revealed as much. The Brown's Chicken case was notorious and the reward money was the subject of numerous newspaper articles, some of which mentioned Bakalla and Lockett by name. (C. 4424-34) Further, counsel in co-defendant Luna's case was aware of the fund and asked Lockett about it during a deposition in 2005, in which she lied claiming she didn't know about the reward. Mr. Degorski provided evidence in the post-petition that Lockett not only

22

knew about the reward money, but was interested in receiving it. (C. 4438-39) The women's knowledge of the reward and whether they hoped to receive it was the strongest area of impeachments because it provided a motive in the form of $100,000 to falsely implicate Degorski and testify against him. What is more interesting is the Palatine Police Chief Koziol was sitting on the board. After Luna was convicted in 2007, he held the money for two years until Degorki was convicted in 2009.

Counsel's failure to impeach Lockett and Bakalla with crucial evidence that would have severely undermined their credibility was professionally unreasonable. Mr. Degorski made a substantial showing of assistance of ineffective Counsel where Counsel failed to investigate and present evidence of witnesses' favorable treatment from the State in exchange for their testimony. Furthermore, Counsel's failure to impeach two key witnesses constituted deficient performance because attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients.

In determining prejudice for Strickland proposes, the Court only should determine whether the Petitioner's allegations, taken as true and liberally construed, demonstrate "a substantial showing that he suffered prejudice based on his counsel's failure." "Prejudice " in this context means a "reasonable probability" that the result would have been different. As the Appellate Court noted in Degorski's appeal a reasonable probability of a different outcome, but for counsel's failures, can be found "even if the chance of acquittal is significantly less than 50%." (Degorski, 2022 IL 180192-U, P. 49 citing People v. Lucious, 2016 IL App (1st) 141127, P45.) As discussed supra, without specifically weighing the possible effect of the financial motive against other impeachment, the Court jumped ahead to the conclusion that even if Degorski's Counsel had "impeached Lockett and Bakalla to the point where a fact finder disregarded their testimony completely" the outcome would have been the same. In conclusion, the Court could not have been carefully weighing the evidence because Lockett and Bakalla's testimony constituted the majority of the State's case against Petitioner. Undermining the women's credibility with evidence that they were financially motivated to implicate Degorski would have deeply weakened the State's case, and failure to do so is sufficient to undermine confidence in the verdict. (People v. Hobson,

23

2014 IL App 1st) Degorski made a substantial showing of ineffective assistance of Counsel where Counsel failed to investigate and present evidence of witnesses' favorable treatment from the State in exchange for their testimony.) Thus, Mr. Degorski asks this Court to please issue a confidential Writ of Habeas Corpus ordering the Illinois Court to either release him or afford him a new and fair trial under your supervision, and within your demanded specific period of time.

## (C) Ground three:

Petitioner was denied his constitutional right to a fair trial, effective assistance of Counsel for defense, equal protection and due process of the law as guaranteed under the Sixth and Fourteenth Amendments of the United States' Constitution where Trial Counsel failed to investigate A. Lockett to simply uncover evidence that her testimony where it applies to Degorski was not credible.

## (C) Ground three
## Supporting Facts:

In support of this claim that Counsel was ineffective for failing to present readily available evidence that would have undermined Lockett's testimony, Mr. Degorski attached significant evidence to his post-conviction petition including 1.) an affidavit from Lockett's roommate at Forest Hospital attesting that Lockett could not have received a confession phone call from Degorski on the night of the crime, 2.) medical records showing that Anne Lockett had a history of dishonesty and no sense of guilt or empathy, 3.) and affidavit from Pat Degorski refuting Lockett's claim that she was afraid of Degorski and explaining that the "tiny bedroom" where Lockett said that Petitioner told her about the murders did not exist at the time, and 4.) an affidavit from Richard Bilik, Lockett's former boyfriend, stating that she was not living at Degorski's home as she had testified to validate her story and furthermore she had not been dating Degorski at the time and recounting that after a later dating/ break-up situation with Lockett she called him to ask if he was involved in the Brown's chicken murders and was actively trying to implicate someone. (C. 4434-4464)

24

Bilik's affidavit further states that during the conversation they discussed the reward money, she asked him to call her if he heard anything about who had done it, and that afterwards Bilik was inexplicably questioned on three separate occasions by Des Plains and Palatine Police Officers about whether he was involved in the murders. (C. 4437-4440)

Trial Counsel's failure to impeach Lockett, a key witness, with all of this evidence, constituted ineffective assistance of Counsel. Counsel had an obligation to investigate evidence discrediting State's witnesses, even if not fully exonerating. Had the Jury learned of the plethora of evidence identified, combined with the $50,000 of reward money in exchange for her testimony, the Jury would have rejected Lockett's testimony and the outcome of the trial would probably have been different. Thus, should've been remanded for a third-stage evidentiary hearing on ineffective assistance, where the post-conviction petition raises a question whether the excluded pieces of evidence were of such of potentially exculpatory force that counsel had a duty to incorporate them into the defense at trial. Moving forward Degorski begs this Court to please issue a conditional Writ of Habeas Corpus ordering the Illinois Court to either release him or afford him a new and fair trial under your supervision, and within your demanded specific period of time.

## (D) Ground four:

Petitioner was denied his constitutional right to a fair trial, effective assistance of Counsel for defense, equal protection and due process of the law as guaranteed under the Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments of the United States' Constitution where Trial Counsel failed to support the arguments in Degorski's Motions to Quash/ Suppress statements with easily obtainable evidence that his oral statement was a product of coercion along with Degorski being misquoted and misquoted by officials. Had Degorski's Jurors heard this evidence of official misconduct, the outcome of this trial would have been different.

**(D) Ground four**

**Supporting facts:**

Mr. Degorski sufficiently pleaded that Counsel was ineffective for failing to call many available witnesses for these motions—Mr. Degorski himself, his two attorneys, friends since 1987, call his May 16, 2002, place of illegal arrest coworkers that listened to Walter Hanger describe to them how Mr. Degorski had just been arrested in the parking lot; using the word "arrested."

Jonathan Simonek along with Casey Sanders-Haefs would have substantiated Degorsk's unrecorded confession was the product of Police misconduct. (C4415-4418) Mr. Simonek (R8219-8243) along with Mrs. Sanders-Haef (R-8361-8402) both later testified in trial that they gave detailed false confessions to the Brown's Chicken murders in 1998 under similar coercive circumstances, would have corroborated Mr. Degorski's testimony if allowed to testify at his suppress hearing.

Although receiving Courts grant deference to attorneys' reasonable strategic decisions, the Council's refusal to call a helpful witness to testify is a classic example of ineffective assistance of Counsel. Easily attainable evidence existed that Degorski was in fact under arrest in Indiana and held incommunicado in Streamwood and in Palatine, IL. First, though arrested simultaneously, the only warrant that was truthfully excited was for Juan Luna in illinois. More importantly and of great concern is that Palatine Police lied to Indiana Sheriffs. Degorski's post-conviction petition Exhibit G is the Sheriff's dispatcher's report after talking within Palatine official - this report has them sending officers out to Mr. Degorski's place of employment at the corner of U.S. 421 and 106th Street to aid in "serving an arrest warrant for murder," that warrant was an absolute lie. (C-4415-4416) Second, in a similar fashion, Palatine Police's own testimony of "just picking up" Degorski was contradicted by each other. Palatine Detectives had Mr. Degorski under surveillance for a week watching Degorski come and go from his Indiana home (R7369-7520) in good running trucks, cars, a van, and a motorcycle. Equally important, for more than eight weeks Law Enforcement officers watched Mr. Degorski pull into his work parking lot in a good, operating vehicle watching him put his tools into another good, operating vehicle to

26

drive home-this doesn't sound like Mr. Degorski had reliable vehicle problems needing to be "picked up" and taken to Illinois for additional questioning. To put in more clearly, it is obvious Palatine Detectives didn't just drive to Indianapolis to just "pick up" Degorski as they claimed, especially if confronted with the fact Detective King testified to Degorski meeting him at the Palatine Police Station one month earlier. Lastly, the Indiana Sheriff's only duty there was to observe that no rights were violated, didn't observe any form of a frisk insinuating any need for an arrest. (See August 31, 2007. Pg. 32:2-6) However, on the contrary Detective King testifies "Detective Briscoe only patted Mr. Degorski's waist for 10 seconds to make sure he (mass murder suspect) didn't have any weapons on him (right to conceal and carry state) with his hands on the bed of the truck before getting into their Police car at the tailgate of Degorski's truck. (R2972-3012, R7400 See also Sept. 20, 2007, 137: 18-24 and 182:19-22) In conclusion, from the Court record alone, Mr. Degorski was obviously illegally arrested in Indiana by Law Enforcement that couldn't get their lies straight before testifying, and ineffective counsel failed to confront witnesses and failed to easily obtain known witnesses in Degorski's favor for an actual defense.

In Mr. Degorski's testimony of his first hand experience, which was the basis of his motion to quash arrest and suppress statements, it was absolutely legally necessary to substantiate the motions. Petitioner's quash/ suppress motions filed by Counsel December 13, 2006, asserted that Mr. Degorski was threatened with violence if he didn't confess and was denied the opportunity to consult with Counsel (C-2695-2700.) The motions included details that AFT teams of Law Enforcement from 3 different Law Enforcement agencies seized Degorski while moving his tools into his truck-now in the back of their Police car Mr. Degorski was forced to sign a consent to travel to Palatine, Illinois which was scribbled in a spiral notebook; hence the local agencies refusal to sign it as it was not a legal document, he was told he would be shot if he ran, that Police would release his family's addresses to angry mob members if he didn't confess, that he would be beaten at "county" if he didn't cooperate, that he was not allowed to sleep, and he was threatened with violence during interrogations. (C 2695-2700) The facts in the motions detailed what Mr. Degorski would've testified to and entirely sufficient to support a finding

27

that confession was involuntary, Counsel was ineffective for failing to present Mr.

Degorski's testimony. The crux of the matter is since there can be no reasonable trial

strategy involved in advancing seemingly "most" motions to suppress statement/ quash

arrest based on involuntariness-as Counsel failed to offer any evidence at the suppress

confession was in fact involuntary-Trial Counsel's ineffective for failing to confront accusers

and to call witnesses known to Counsel for impeachment of accusers against Degorski

including Degorki himself. If Counsel had been competent the outcome of the trial would

have been different. Mr. Degorski asks this Court to please issue a confidential Writ of

Habeas Corpus ordering the Illinois Court to either release him or afford him a new and fair

trial under your supervision, and within your demanded specific period of time.

## (E) Ground five:

Petitioner was denied his constitutional right to a fair trial, effective assistance of

Counsel for defense, equal protection and due process of the law as guaranteed under the

Sixth Fourteenth, Fourth, Fifth, and Ninth Amendments of the United States' Constitutions

where Trial Counsel prevented Degorski from testifying on his own behalf.

Right to testify.

## (E) Ground Five
## Supporting Facts:

Mr. Degorski's post-conviction petition made a substantial showing that Council

interfered with his constitutional right to testify by misinforming Mr. Degorski that the

decision to testify wasn't up to him. The trial record demonstrates that Mr. Degorski's

confusion when Degorski responded "They said there's no need?" instead of responding

with another affirmative "yes" or "no." however, the Court abruptly stops, choosing not to

make a further inquiry during attempted admonishment (sup. R.V.@. 5041-43 TR.

8746-48) Mr. Degorski obviously did not understand that this decision about whether to

testify was his, and not one made by his attorneys. Mr. Degorski's attached affidavit from

his mother Par Degorski also confirms that Defense Counsel wouldn't allow Degorski to

28

testify. (See exhibit 3 A6-7) Without question, Degorsi made an absolute showing that he was prejudiced by council's denial of his right to testify-without question the trial would have for sure had a different outcome. Surely, Mr. Degorski's testimony would've impeached Anne Lockett, and the remaining evidence against him. Given the absence of any physical or forensic evidence connecting him to the offense , there is further probability the the outcome of the trial would have been different if the Jurors had heard Mr. Degorski's testimony. Thus, again, Mr. Degorski asks this Court to please issue a confidential Writ of Habeas Corpus ordering the Illinois Court to either release him or afford him a new and fair trial under your supervision, and within your demanded specific period of time.

## (F) Ground six.

Petitioner was denied his constitutional right to a fair trial, effective assistance of Counsel for defense, equal protection and due process of the law as guaranteed under the Sixth and Fourteenth Amendments of the United States' Constitution where trial counsel failed to object to admission of cumulative and prejudicial DNA match evidence at trial, when Degorski was excluded.
DNA

## (F) Ground six
## Supporting Facts:

Mr. Degorski's post-conviction petition alleged that Trial Counsel's failure to object to the many Illinois State Police Crime Lab Tech's confusing and highly technical testimonies about the DNA and fingerprint evidence of co defendant Juan Luna, and Appellate Counsel's failure to appeal the issue, prejudiced him because the evidence was improperly used to conclude that if Luna was guilty Gegorski must be as well (C 4418) The medias and even Degorsk's own family missed the ineffective Counsel's boring stipulation of Jan Johnson's quick sentence that Degorski didn't match the second DNA. The Court below substantially erroneously erred, basically making their decision ruling against Degorski that

29

guilty-referring to a DNA match. (Degorski 2022 IL 180192-U P. 72, 11, 24, 74, 76) They stated "a fingerprint matched Luna. A DNA (one) from a chicken bone matched Luna's DNA and of course would have excluded Degorski as a contributor to the singular sample." They again stated in their decision that DNA and fingerprint evidence implicated Juan Luna, who was Degorski's best friend. Agreeable, this is highly incriminating, but the Appellate Court ignored what was important to note-there were two DNA samples recovered from the scene from multiple pieces of chicken and bones and with over 200 unmatched fingerprints; none match Degorski. Degorski was excluded from all forensic evidence!

To clarify, Mr. Degorski was excluded as a contributor of the second DNA. (R-8827) The world renown Jan Onstwedder matched Luna to a palm print, by excluded Degorski from all partial palm prints in blood on a mop, and a partial print in blood on a lid recovered near the outside garbage dumpster where Degorski was again excluded (R 8409-8475) from all forensic evidence. Had Jurors heard this from the actual witness on the stand, they would not have missed it. Furthermore the outcome of the trial would have been different.

Mr. Degorski asks this Court to please issue a confidential Writ of Habeas Corpus ordering the Illinois Court to either release him or afford him a new and fair trial under your supervision, and within your demanded specific period of time.

### (G) Ground seven:

Petitioner was denied his constitutional right to a fair trial, effective assistance of Counsel for defense, equal protection and due process of the law as guaranteed under the Fourteenth Amendments of the United States' Constitution where the State further and unnecessarily bolstered credibility into Assistant State's Attorney Michael McHale, who took Degorski's recorded oral confession, was now a sitting Cook County Circuit Court Judge, and McHale was allowed to testify as a human lie detector expressing that he-a sitting Judge- believed the confession he elicited from Degorski was reliable and truthful. Guaranteed under the Fourth, Fifth, Sixth, Ninth, and Fourteenth Amendments.

## (G) Ground seven
## Supporting Facts:

Michael McHale knew better than to blatantly testify against Degorski stating he is a reliable "human lie detector." All Degorski's Jurors admitted to giving more weight to Law Enformanects' testimony, and they were only "lightly" instructed not to do so. The Court further erred allowing the State to unnecessarily introduce Michael McHale as a sitting Circuit Court of Cook County Judge (R 6424-25) Erred because society's ultimate authority figure is a Judge. The proper context for this case at the time of Degorski's May, 2002, interactions with McHale, was a felony Review Cold Case Assistant State's Attorney- a very reputable occupation in its own right. Although this is absolutely true ASA McHale was allowed to unnecessarily bolster his testimony as a now sitting Judge. If this wasn't already enough bias against Degorski the State closed their case with McHale using his trusted authority status to sway the Jurors with whom they should believe; when he improperly testified as a human lie detector. No normal witness is allowed to express their opinion as to another witness's credibility, her McHale does just that "his statement (confession to Brown's murders) to me was reliable"-taking this completely out of context from Degorski's Counsel's actual line of questioning. This intentional act shouldn't be misconstrued as harmless error. Degorski was deprived of his right to a fair trial. McHale's related subsequent remarks were a result of a flustered Public Defender, engaged in at times a hostile and contentious cross examination with McHale barking "Counsel" (eleven times) as if he were the Judge on the bench. This should not have been allowed from the witness stand where he was giving testimony and being cross examined.

This case has been absolutely plagued with very detailed false confessions from obviously innocent people that were spoon-fed crime details only the Police and the actual murders would have known. Also related to the case, Police Detectives King and Broscoe conducted lengthy interrogations of James Degorski at the Streamwood, Illinois Police Station before ASA Michael McHale met with him, and McHale slept while Police interrogated Degorski for several more hours. (R 7410-35, 7947-57) The gist of trial

counsel's cross-examination of McHale was to establish that King and Briscoe had the opportunity, in McHale's absence, to employ the same aggressive interrogation techniques on Degorski that had been used by the Palatine Police to obtain the highly detailed false confessions of Jonathon Simonek and Casey Sander Haefs to the Brown's Chicken murders. That is it. Why didn't Counsel ask the Court to dismiss this case at this point? It was obvious Law Enforcement was fishing for anyone.

For example, during cross-examination, McHale acknowledges that when he returned to the station at 8:15pm. After getting something to eat, and was told that Degorski was already "confessing" to Detective King and Briscoe in his absence, he did not interrupt the Police interrogation or attempt to view the interrogation through a one-way mirror from the adjacent room. Instead, McHale simply waited in another room, down the hall while the Detectives interviewed Degorski. At 10:15p.m. When Detectives were done questioning Degorski, King came out and got McHale. (R 7986, 7989-92) When King introduced McHale to Degorski at 10:30p.m, King had already spoken to Degorski for a number of hours. (R7993)

McHale was unaware and didn't care of what transpired in the interview room between Police and Degorski during the time McHale slept after his first brief interview with Degorski. (R 8003-5) Sleeping is completely suspect in itself if there was any truth to Degorski being completely cooperative after "confessing" to this 91/2 year old cold case crime! However, when McHale awoke at 3:45a.m, King told him Degorski was "now giving a lot more information about the murders" (% 8005) Everything Degorski supposedly told McHale about the Brow/s Chicken murders occurred after the detectives had interrogated Degorski for a number of hours. (R 8003-6, 8015)

Defense Counsel also elicited from McHale that it was standard protocol to ask a suspect whether the Police or State's Attorney had shown him any reports or diagrams during the interrogation. However, McHale never asked Degorski that question because McHale had himself shown certain evidentiary items to Degorski, and didn't feel the question of what was shown to Degorski outside of his presence was appropriate in this case. (R 8010-11)

The following exchange then took place:

**Q:** *And you didn't ask him if he had seen photographs or diagrams of the scene?*

**The Court:** *That's been asked and answered. Move on.*

**Counsel:** *And those things would be important would they?*

**McHale:** *I don't know what you mean, they would be important. What do you mean by that?*

**Q:** *Well, when you talk about getting a statement that's reliable and truthful, you want a statement that is not contaminated by someone having information from outside; right?*

**A:** *I suppose that's true. But his statement to me was reliable.*

**Q:** *That's your judgment?*

**A:** *You got it. It sure is!*

**Q:** *Based on your time that you spent with Mr, Degorski?*

**A:** *Based on a three hour, face-to-face conversation where he detailed how he murdered seven people, yes, and I believed him Counsel.*

**Q:** *So, you want Mr. Degorski to be convicted?*

**A:** *I don't…I want this Jury to decide what the right thing to do is, I'm just telling you what happened despite a lot of insinuations that you are making. I'm telling you that what I did that night truthfully, and this is for a Jury to decide.*

**Q:** *Mr. McHale, you just felt the need to give us your opinion about whether Mr. Degorski's statement to you…*

**State:** *Object, arguing with the witness, you Honor. Counsel is arguing with the witness.*

**The Court:** *Overruled at this time.*

**Q:** *…was believable or not?*

**A:** *You asked me the question if it would be reliable, and I told you why I believed it was reliable, yes.*

**(R 8012-14) (emphasis added)**

Based on McHales testimony, the defense later moved for a mistrial. Counsel argued that it was improper for McHale to have volunteered his personal opinion that Degorski's confession was reliable and that McHale believed the confession to be truthful. Counsel also asserted that the resulting prejudice was compounded because the Court had allowed the prosecution, over objection, to inform Jurors that former ASA McHale was now a judge. (R 8735-41) The State argued that McHale's testimony was not voluntary, but was responsive to defense counsel's questions on cross-examination. (R 8741-44) The Trial Court found that, based on "the totality of the questions and the responses, " McHale's testimony was not inappropriate, and denied the motion for a mistrial (R 8745) Simply because the Court ignored the well established pattern of practice of the Palatine Police contaminating confessions with details never released to the public related to this case.

Whether to grant or deny a motion for mistrial is in the discretion of the trial Court. The Trial Court below abused its discretion in denying the defense motion for mistrial. Contrary to the Trial Court's finding, it was an egregious error for McHale to express his personal opinion that Degorski's confession was reliable and truthful.

The controlling law is well-established. A witness's opinion regarding the defendant's guilt or veracity is irrelevant and invades the Jury's exclusive fact-finding province. Defense counsel's proper inquiry did not invite McHale's improper and unresponsive answer. The improper unresponsive answer by the prosecution witness, who was a former assistant State's Attorney, now a judge, was not accidental, but was a deliberate tactic that was highly prejudicial. Moreover, Judge McHale, an experienced former prosecutor and sitting judge certainly should have known better than to inject his own opinions to the defendant's guilt into the trial's proceedings below, regardless of any perceived missteps by defense counsel.

Finally, the error here cannot be characterized as harmless. While there was significant forensic evidence connecting co-defendant Juan Luna to the Brown's Chicken murders, there was absolutely no such evidence connecting James Degorski to the crime.

34

Rather, the State's evidence against Degorski rested almost entirely on admissions he purportedly made to former girlfriends Anne lockett and Eileen Bakalla, and on his allied oral confession to Police and ASA MsHale. The defense argued that Degoersi's admissions to Lockett and Bakalla were nothing more than false braggadocio intended to impress the girls, and that Degorski's confessions to the Police and ASA McHale were the false product of the interrogation techniques utilized by the Palatine Police Department; the same interrogation techniques utilized by the Palatine Police Department; the same techniques which had produced the false confessions Simonek and Casey Sander Haefs to the Brown's Chicken murders. (R 6508-09, 8968-69, 8989-92)

Based on the lack of evidence linking Degorski to this crime, plus key witnesses Lockett and Bakalla impeached where they both drag Degorski into this crime, the Police eliciting false confessions to this crime, James Degorski's guilt or innocence boiled down to one question: Were James Degorsk's confessions to the Brown's Chicken murders true or false? If Jurors concluded that those confessions were true, that finding would be sufficient to support a verdict of guilty in this case. However, if the Jurors concluded that those confessions were false, that finding would require a verdict of not guilty, for there was insufficient evidence besides those confessions to support Degorski's conviction beyond a reasonable doubt.

The uninvited testimony of former ASA and current Judge Michael McHale that he personally believed James Degorski's confessions was reliable and truthful violated Degorski's right to have the Jurors decide the truth or falsity of Degorsk's supposed confession quotes by McHale and Law Enforcement, free from the the improper influence of the opinion of such as authoritative and experienced Law Enforcement and judicial figure on that ultimate and controlling question in this case. For that reason, McHale's improper testimony resulted in prejudicial error which deprived Degorski of his constitutional right to due process, and to a fair and impartial Jury Trial on the issue of his guilt or innocence with Degorski's Jurors who give more weight to Law Enforcement's testimony. McHale very well could have swayed Jurors' verdicts against Degorski. Respectfully, Mr. Degorski humbly asks this Court would you please issue a conditional

35

Writ of Habeas Corpus ordering the Illinois Court to either release him, or at least afford him a new and fair trial within your demand specific timeline.

## (H) Ground eight:

Petitioner was denied his constitutional right to a fair trial, effective assistance of counsel for defense, equal protection and due process of the law as guaranteed under the Fifth and Fourteenth Amendments of the United States' Constitution when the Jurors were forced to view a zero probative value and extremely gruesome videotape of showing five victims in full rigor being stuffed into body bags.

## (H) Ground eight
## Supporting Facts:

Every defendant has the constitutional right to a fair Jury Trial, in which guilt is determined solely on the basis of the admissible evidence, requiremeing the exclusion of incompetent and prejudicial evidence. For that reason, the admission of evidence, the sole purpose of which is to prejudice the defendant by arousing anger, hate, and passion in the Jury, is an error.

When presented with photographic evidence, a Trial Court must weigh its probative value against its prejudicial effect on Jurors.

In the present case, the Trial Court abused its discretion by admitting into evidence, over defense objection, an extremely gruesome and entirely irrelevant videotape showing the removal of the bodies of five victims from a freezer in the Brown's Chicken restaurant. The undoubted effects this State's evidence videotape had on Jurors was to horrify them with ghastly images of the aftermath of the victims suffering and death, to arouse in them hatred and disgust toward Degorski. As a result, Degorski was deprived of his innocence.

Proving Degorski's innocence relied on by the defense at trial was that unlike Juan Luna, James Degorki was eliminated as a match to any of the massive forensic evidence recovered at the crime scene. Defense counsel stressed to the Jurors in an opening statement that as part of Police investigation, the State's forensic experts who analyzed

36

that evidence made sure they eliminated any Law Enforcement personnel who responded to the crime scene as having left any of the forensic evidence record there. Therefore, Council's strategy was to only theorize that certain items of evidence (DNA, fingerprints, shoe prints, etc.) which remained unidentified after elimination of all Law Enforcement personnel-specifically including several photographs left there by Luna's unknown accomplice. (R 6499-6502)

In support of this theory, the defense called Charles Principe, who was the Assistant Director of the Northern Illinois Police Crime Lab in 1993. (R8612-16) Principe photographed shoe print impressions from several areas of the restaurant. (R 8617-20) However, he was not told about the bloody shoe prints in the east freezer during the body recovery process. Nor did anyone alert him to the existence of those prints while he was working at the crime scene. Had Principe been so alerted and found that the shoe prints were of evidentiary value, he would have photographed them. (R 8620-21)

During the State's case, however, the prosecution had sought to establish that those bloody shoe prints were not left there by an unknown killer as the defense theorized, but by Det. Robert Jacobsen of the Cook County Sheriff's Police Department-the person who entered the freezer and removed the victim's bodies. (R7720-22)

Jacobsen identified People's Exhibits 172A-C as a sequence of photographs taken during the body removal process. Claimingnhe was the only person inside the freezer when those photographs were taken. (R7722-26) When asked how similar the show print impressions on the photographs were to the soles of the shoes worn that day, Jacobsen rescinded, "They're my shoes." (R 7727) Jacobsen also stated that when he got home that night, he threw out his blood-soaked clothing and shoes. (R 7727-28)

On cross-examination, the defense sought to impeach Jacobsen's testimony that the shoe print impression in the freezer were his, by establishing that Jacobsen not only failed to tell anyone during the body removal process that he had contaminated the crime scene, turn over these shoes, or at least do ink and paper impressions of the sole's tread pattern of his shoes, but failed to include in any Police report, that left the bloody shoe print impression in the freezer, and crime scene; before he destroyed evidence.

37

In fact, Jacobsen had never discussed with anyone in Law Enforcement whether the January 1993, bloody shoe print impressions in the freezer were made by him, until he spoke to one of the trial prosecutors on the telephone the day prior to his September 2009, testimony in this case. During that conversation, Jacobsen was asked by the prosecutor whether he left the shoe print impressions in the freezer. After being shown People Evidence 173A-C photographs by the prosecutor the morning of his testimony, he told the prosecutor the shoe print impressions were made by him. (RT 7742-43)

Though everyone including the Jurors know the victims bodies were eventually removed from the crime scene and returned to their loved ones. Following Jacobsen's cross-examination, the prosecutor argued that the dense theory created the impression that the removal of the bodies is documented, but it is in fact documented by approximately a two-minute video." The overzealous prosecutor claimed that this (only a theory) "opened the door" for the prosecution to play that video for the Jurors during Jacobson's redirect examination. (R 7750) When clearly documenting should only be construed as proof of Jacobsen's sole read/ wear patterns never preserved for later eliminations his shoe print photo doesn't end up in a defendant trial theory, as it did here.

Defense counsel objected on the ground that the probative value of the video was limited because it doesn't support or contradict anything that is going on here this morning, "while the images on the video were very graphic and prejudicial. ( R 7752-53) The prosecutor responded that the defense "created the impression in the eyes of the Jury that there was no documentation of the removal process of the bodies and everything this officer was doing inside, " while in fact, "there is video documentation and the Jury should should be able to see it" ( R 7753 The Court agreed with the prosecutor and overruled the defense objection, finding that "there was an impression on outstanding cross-examination that there was no documentation of this. (R 7753)

The Court then abused his discretion allowing the prosecution to play the videotape for the Jurors. (Peoples trial Exhibit 175) (R 7755-56) Let's remember this, at the time unidentified shoe prints was a theory that it could be Luna's unknown accomplice. The Courts should've daily allowed the defense to just use another unidentified shoe print, or

38

strike all shoe theories telling the defense to move on.

That 2-minute, 33-second videotape shows the removal of the bodies of five, bullet-riddled and stabbed victims of this brutal crime from the east freezer of the restaurant hours after the crime had been committed. It shows Detective Jacobsen pulling out of the freezer, one by one, bloodied human corpses that have been stiffened by either rigor mortis or by the low temperature in the freezer, their limbs fixed in contorted poses, as Police struggled to drag, lift them, and stuff them into body bags. The Trial Court erred in allowing the Jurors to view this videotape, as the graphic and gruesome images it conveyed to the Jurors were irrelevant to any theorized any issue in the case. And while the videotape does establish that Jacobsen removed the bodies, it in no way establishes that jacobsen left any-let alone all-of the bloody shoe prints on the freezer floor. The camera wasn't fixed on the freezer the whole time, to see if anyone else entered the freezer. It is simply not possible to discern from the darkened interior of the freezer shown on the videotape anything about those bloody shoe prints. It was impossible to discern what shoes Jacobsen or any of the Police were wearing, their shoes completely covered above their ankles and opaque torn plastic grocery bags. The State's claim that the defense opened the door to admission to the videotape was nothing more than a disingenuous attempt to convince the Trial Judge to admit an otherwise inadmissible piece of extremely gruesome, irreverent evidence with absolutely zero probative value, except to inflame and prejudice the Jury. Unfortunately, the State was successful in that effort arousing strong emotions against Mr. Degorski understandably even gruesome or disturbing photographs may be admitted into evidence if they are "relevant to establish any fact at issue" but this wasn't the case here. This prejudice was compounded when over objection, that exhibit followed the Jurors into the Jury Room, and reminded them as they deliberated Mr. Degorski guilt or innocence. (R8658-60)

The Jurors were charged with the duty to decide this case based solely on the relevant and admissible evidence presented by the parties. Given the total lack of forensic evidence connecting James Degorski to the crime, the Jurors faced a choice between accepting admissions and confessions as true, or rejecting them as untrue and immature

braggadocio or more likely false product of Palatine Police Department's aggressive interrogation techniques, and misquotes of Degorski. Victims' bodies, the real possibility exists that the verdict of guilt in this case was influenced, at least in part on the Jurors' horrified emotional response to the gruesome and grotesque images portrayed therein.[6]

Trial prosecutors and Trial Courts share the duty to avoid the introduction of evidence in which the danger of unfair prejudice substantially outweighs its probative value. Both failed that duty in the present case. By asserting a transparently disingenuous rationale for introduction of the videotape, the Trial prosecutors sought to obtain an unfair advantage by appealing to the passions and emotions of the Jurors. And, by allowing that irrelevant and prejudicial videotape to be shown to the Jurors, and to be taken into the Jury Room during their deliberations, the Trial Court abused its discretion.

Respectfully, Mr. Degorski humbly asks this Court would you please issue a conditional Writ of Habeas Corpus ordering the Illinois Court to either release him, or at least afford him a new and fair trial within your demand specific timeline.

## Conclusion:

After reading the statements of facts from the Court Records it would be hard to deny that the State didn't knowingly use perjured testimony to wrongfully convict Mr. James Degorski. Equally important, Counsel's ineptitude should not be misconstrued with any form of trial strategy during sentencing in this death penalty case. Trial Counsel polled the Jurors verdict of "natural life" with no/ death penalty. (R 11088) When none of Degorski's Stand by Counselors corrected him the Court slowly asked Counsel if he talked to his client about this. Accordingly, based on constitutional law the cumulative effect of all eight grounds along with the record laid out in the statement of facts James Degorski prayerfully asks this Court would you please issue a conditional Writ of Habeas Corpus ordering the Illinois Court to either release him, or at least afford him a new and fair trial within your demand specific timeline. Thanks for your time and consideration.

## PART IV - REPRESENTATION

Give the names and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A)  At the preliminary hearing: _____

(B)  At arraignment and plea: _____

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

(C)  At trial _____ Judge Mark Levitt _____

(D)  At sentencing _____ Judge Mark Levitt _____

(E)  On appeal _____ Appellate Defender Charles W. Hoffman _____

(F)  In any post-conviction proceeding _____ Jennifer Bonjean Ashley Cohen _____

(G)  Other (state): _____ N/A _____

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

☐ Yes   ☒ No

Name and location of the court which imposed the sentence: _____ N/A _____

Date and length of sentence to be served in the future _____ N/A _____

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: March 16, 2023
(Date)

_____ N/A _____
Signature of attorney (if any)

**I declare under penalty of perjury that the foregoing is true and correct.**

James Degorski
(Signature of petitioner) James Degorski

M09414
(I.D. Number)

Stateville Correction Center
P.O. Box 112
Joliet, IL 60434-0112
(Address)

OFFICIAL SEAL
JANIS R GARRISON-ELMORE
NOTARY PUBLIC, STATE OF ILLINOIS
COOK COUNTY
MY COMMISSION EXPIRES 11/04/2024

[If you need additional space for ANY section, please attach an additional sheet and reference that section.]

Rev. 06/29/2016

41

# APPENDIX TO THE HABEAS CORPUS

**Exhibit**          **Post**

| | | |
|---|---|---|
| 1. | Carrie Ann Walsh's Affidavit | A1-A2 |
| 2. | Richard Bilik's Post-Affidavit | A3-A5 |
| 3. | Pat Degorski's Post-Affidavit | A6-A7 |
| 4. | Melissa's Facebook & Palatine Village's balance Sheet | A8-A9 |
| 5. | 9-23-02 Daily Herald article regarding how they knew about the reward money: Degorski, Lockett, Benz, and Blake | A10-A12 |
| 6. | Hamilton Sheriff's call for service: "serve arrest warrant for murder" | A13 |
| 7. | Note Pad Palatine Police witnesses | A14 |
| 8. | Palatine Police property inventory w/ no wallet, credit cards, asthma inhaler, allergy meds | A15 |
| 9. | 5-20-02 Chicago Tribune article Koziol recommends who gets the reward money | A16-A18 |
| 10. | Degorski's 2-24-23 required affidavit | A19-A23 |
| 11. | Degorski, 2002, IL 180192-U IL App. Ct. June 13, 2022, dismissal | A24-A48 |



$E_{XHIBIT}$ |
1of2

## AFFIDAVIT OF CARRIE WALSH

1. My name is Carrie Ann Walsh and my birthday is September 1, 1975.

2. In January 1993, I was hospitalized at Forest Hospital in Des Plaines, Illinois.

3. I recall having a roommate whose photograph is attached to this affidavit. I did not remember her name but I have been told by attorneys that her name is Anne Lockett.

4. I recall that my roommate (Anne Lockett) was on suicide watch for an extended period of time while we roomed together at Forest Hospital.

5. I was hospitalized at Forest Hospital numerous times from the ages of 13 to 17.

6. I specifically recall that there was one payphone near the nurse's station. However, patients did not have unlimited or unsupervised access to the payphone.

7. Also, patients on suicide watch were not permitted unsupervised access to the day room, the cafeteria and certainly could not accept or make phone calls to third parties.

8. In fact, only immediate family members were able to contact patients and even then it was not easy to communicate with family. I specifically remember that my grandfather passed away while I was hospitalized and my parents had difficulty reaching me because communication was heavily monitored by nurses and staff.

9. In addition, there were no televisions in patients' rooms and a new admit who was on suicide watch would never have had access to the day room where the only television was located.

10. We were children and were highly supervised.

11. I understand that my former roommate claims that she received a phone call from a boyfriend shortly after she was admitted to Forest Hospital after a suicide attempt.

A 1

56

Exhibit 1

12. Based on my extensive experience at Forest Hospital, there is simply no way she would have been permitted to receive a phone call from a boyfriend, especially while on suicide watch.

13. Until February 18, 2016, I was never contacted by any attorneys or investigators regarding my stays at Forest Hospital and my knowledge of Anne Lockett.

14. I do not know James Degorski and have only a vague recollection of the Browns Chicken Murder.

*Carrie A Walsh*

CARRIE WALSH

Subscribed and Sworn to Before me
On this 15 Day of March 2016

*Ashley Cohen*

NOTARY PUBLIC-STATE OF NEW YORK
NO. 02CO6337531
Qualified in New York County
comm Expires 02/29/20

A2

52

## Affidavit of Richard James Bilik



EXHIBIT 2
1 of 2

I, RICHARD JAMES BILIK, do depose and swear under oath to the following:

1. I am currently incarcerated at Pinckneyville Correctional Center.

2. I am 39 years old and was born on November 11, 1976.

3. My home address is 1762 S. White Street in Des Plaines, Illinois.

4. In September 1992, I was a patient at Forest Hospital in Des Plaines, Illinois.

5. I met Anne K. Lockett at Forest Hospital during my Hospitalization. When we met in Forest Hospital, Anne did not have a boyfriend and was not dating anyone.

6. My doctor at Forest was Ralph Menezes.

7. When Anne was released from Forest Hospital we began dating. We dated for approximately three to four months. We frequently attended out-patient visits together after our in-patient hospital stay ended. We were dating in early January, 1993.

8. During the time I dated Anne Lockett, we attended a few concerts together that I can recall.

9. On November 25, 1992, we attended a Megadeth Concert at the UIC Pavilion in Chicago, Illinois. Suicidal Tendencies was the opening act for Megadeth at this concert.

10. We also attended a free Saigon Kick Concert while visiting Anne's sister, Cindy Lockett in Champaign-Urbana.

Exhibit 2

11. During the peroid of time I dated Anne, she never mentioned
    the Browns Chicken Murder or her belief that James Degorski
    was responsible for the murders. But I do recall meeting
    James Degorski once because they were friends.

12. After Anne and I broke up, she contacted me a few months
    later to ask me if I committed the Browns Chicken Murder.
    I distinctly recall finding it sterange that Anne would
    randomly ask me whether I had committed the Brown Chicken
    Murders.

13. I told Anne I was not involved in the Browns Chicken Murder.
    She told me that whoever came forward with information would
    be entitled to reward money and that if I heard who might
    have done the murders, I should contact her.

14. Shortly after this conversation with Anne, I was inexplicably
    questioned about the Browns Chicken Murder and whether I
    had any involvement in the murders on three (3) separate
    occasions by Des Plaines and Palatine Police Officers.

15. I later learned that Anne claimed that James Degorski told
    her he had committed the Browns Chicken murders and testified
    to that effect at James Degorski's criminal trial.

16. In October, 2009, I wrote a letter to James Degorski remind-
    ing him that we had met once and telling him about my experience
    with Anne.

17. I was never contacted by James Degorski's trial lawyers.
    Had his lawyers contacted me, I would have told them what
    I have stated here along with my belief that it seemed like

A4

Exhibit 2

Anne was very interested in collecting on the substantial reward money and was willing to implicate anyone, including me.

18. I am ready and willing to testify to the above events at any hearing or trial.

19. I have not been coerced, pressured, threatened or made any promisses in exchange for my testimony.

RICHARD BILIK

Subscribed and Sworn to Before me
On this 9th Day of June , 2016

NOTARY PUBLIC

OFFICIAL SEAL
BILLY ROLLA
Notary Public - State of Illinois
My Commission Expires 1/09/2019

A 5



EXHIBIT 3
1 of 2

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS, )
)
          Respondent, )
)
-vs- )
) No. 02 CR 15430(01)
)
) The Honorable
) Vincent M. Gaughan
JAMES DEGORSKI, ) Judge Presiding.
)
          Petitioner. )

## AFFIDAVIT OF PAT DEGORSKI

1. I am the mother of James Degorski.

2. I am familiar with the testimony Anne Lockett gave at Jim's trial.

3. The bedroom Anne described as the location where Jim confessed to her in 1993 did not exist in 1993.

4. Prior to 1993, our basement had flooded numerous times and Jim had renovated the basement and moved out of his room in the basement. The room described by Lockett in her testimony simply did not exist in 1993.

5. Also, I know Anne testified that she was afraid of Jim and that was the reason she did not come forward earlier to tell what she knew.

6. But Anne never seemed afraid of Jim. Even after she moved away, Anne called my house phone numerous times looking for Jim. She was friendly enough and complained that Jim never returned her pages. She asked if Jim had changed his number and always inquired about his whereabouts,

A6

84

Exhibit 3

his personal life and asked how she could reach him. I never gave Anne

any personal information because Jim told me not to.

7. I told Jim's lawyer Mark Leavitt all of this information and told him I was

willing and able to testify to these facts, but Mark always blew me off.

MARK
JCTED LIKE HE

8. Mark was extremely uncooperative with me and seemed convinced from

,AS INTERESTED the very beginning that Jim was guilty.

VD WAS TAKING

ARE OF IT, OR

ILKING TO THESE

:OPLE. ONLY

Mark was only concerned with the death penalty phase of the trial and

refused to follow up on any information related to Jim's innocence

provided by myself or Jim.

2 THE TRIAL 10. Even when Jim told Mark over and over that he wanted to testify, Mark

D WE FIND OUT

FWAS NOT

DING ANY OF

made it clear that Jim was not going to testify and tried to get me to

convince Jim not to testify.

'E THINGS

E SAID HE

,AS ON TOP

=F.

11. I was terrified for my son and my family. I trusted Mark to do the right

thing but in hindsight it is clear that Jim had virtually no counsel at all.

12. I make these statements freely and voluntarily and will testify to the same

at any hearing or proceeding.

_Pat Degorski_
PAT DEGORSKI

Subscribed and Sworn to Before
Me on this 3rd Day of August

_Ashley Oler_
NOTARY PUBLIC

ASHLEY B L...
N...a , P..b.. Stat.  New York
Registratic       33 531
Qualified Ir       County
Commission Expire Fer 29 20 20

A7

facebook.com

Home · goNYLS

Melissa Benz Ippach

Melissa Benz Ippach    Timeline ▼    2011 ▼    Highlights ▼

LIKES

THE ULTIMATE
BOW

Gerber

MARTY AND
SONS

Melissa Benz Ippach

**Melissa Benz Ippach**    Home

*J,* Add Friend

Recent

2016
2012
2011
2010

**Melissa Benz Ippach**
May 9 2011

If you're bored Wednesday night at 9, watch Discovery ID channel. It's a special show about the Brown's Chicken murders and my friend Anne is in it.

Share

👍 3 people like this.

Dane Zychowski Cashmore I'll be watching.
May 9 2011 at 11:26pm

Jason Hill shes still your friend?
May 14 2011 at 7:30am

**Melissa Benz Ippach**

Thanks so much to my friends and family for generously donating to MDA. I surpassed my goal of $800 because of you's.

Share

👍 Mike Bloom likes this.

Melissa Benz Ippach posted from DELETE - Liver Life Walk

Sponsored 9;

Shop Warby Parker
warbyparker.com
5 days. 5 pairs of glasses.
100% free. Find your perfect
pair starting at $95 w/lenses!

1● Chat (21)

EXHIBIT 4
1 of 2

Exhibit 4



A9

Daily Herald

Mon Sept. 23 2002

EXHIBIT 5
1 of 3

differ. The climate on this cool, wet     start the race 10 minutes later     See DHILL on PAGE 4     JI Israelis themselves debased the     Ignited his clothing instead.     See Thppert's on PAGE 7

# Tipster in Brown's Chicken murder case finally speaks about the experience

**BY LEE FILAS**
*Daily Herald Staff Writer*

In her first interview, woman defends friend Anne Lockett, who kept what she knew about the murders secret for nine years, and says she negotiated about coming forward with Lockett

It seemed a normal enough phone call at first.

It was about 5 p.m. on a weekday. Police would later pinpoint the date as March 25.

Melissa, 27, who has asked that her last name not be published, has never spoken publicly about that call, which wound up leading to arrests in the 1993 Brown's Chicken & Pasta murders of seven workers. She recently agreed to tell her story

James Deponai

in the Daily Herald.

At the time of the call, Melissa was at home paying bills, trying to get through them in time for dinner.

On the other end of the line was Anne Lockett, an old friend from High School friend who now lived in Charleston.

"It wasn't unusual that she called."

said Melissa, who chatted by phone with Lockett 27, a few times a year to catch up on gossip. "I had left her a message on her machine probably two or three weeks before. ... So I thought she was just returning my phone call."

But the conversation quickly took an unusual turn.

"The reason Anne was calling me was to ask me if I would forward an anonymous letter to the police for her," Melissa said.

At first, Melissa said, Lockett wouldn't say anything more about

the letter, telling her only in general terms that she had information about a crime.

The letter would provide police with those details while keeping Lockett safely anonymous. She needed Melissa, of suburban Chicago, to mail it so it wouldn't have a Charleston postmark, Melissa believes.

Curious, Melissa persisted in asking questions. After about 15 minutes, Lockett started to crack.

"She goes, 'Do you remember when I told you, like, a dozen times

before, I am body called looking for me, to tell them you don't know where I'm at?' I'm like, yeah, well maybe, you know, there's a number looking for Anne,' Melissa said.

It wasn't a crime? Lockett was avoiding, Melissa said, but Jim Degorski, another former friend student and Lockett's ex-boyfriend.

Degorski and another former friend student, Juan Luna, had committed the murders, Lockett finally

See Tippert's on PAGE 7

# Brown's: Lockett wanted to come forward, friend says

*Continued from Page 1*

police.

## The friendship

The road that led Melissa and Anne Lockett to this point had begun, like many friendships, in high school.

The two knew of each other in their teen years yet; the two bonded in gym class when they began poking fun at a classmate who was passing notes.

"We'd bend forward [to hide laughing our nearly every day and shared a locker.

The friendship continued through high school, and into the long time off, Melissa said, when either one met a new boyfriend, as was the case when Lockett started her relationship with Degorski in high school.

Melissa said Lockett met Degorski when he dated one of Lockett's and Melissa's other friends.

Melissa found him controlling, and Degorski wasn't fond of her either. He steered Lockett away from her, Melissa said, and because of the conflict, Melissa lost touch with her friend during their senior year of high school.

## Separate lives

It was during this separation that the Brown's Chicken & Pasta murders happened, just a few days before Christmas in 1993.

Even in Palatine, residents at the time, Melissa remembers the event well, and she shared the revulsion the community felt.

The case hit close to home because the numbers in the home. Shortly after the murders, police arrested Melissa's friend, Martin F. Blake.

Police eventually released him. When they did, Melissa said she and her sister went to the police station to pick him up.

Blake, reached by phone at his Tennessee home, said the community member who picked him up that day, but couldn't remember if it was Melissa. Melissa confirms the friend, though not the numbers in the home.

Melissa thought she would never have to deal with the murders up close and personal again.

She was wrong.

## The fear

After Lockett and Degorski split up in 1994, Melissa renewed the friendship with Lockett. However,

---

leave an anonymous tip that way?' She said she didn't want to be part of that. And I told her, I said, 'Why don't you want to come forward with this?' And she said that she was afraid, that she was afraid that she would be in trouble. And at that point, I didn't really want to know. I have some friends (on the police department). Let me call them and find out what the legalities are involved in all this," she said.

When asked what led her to press her friend so hard instead of just forwarding the letter, Melissa gave an intuitive answer.

"I didn't like being asked to do something if I didn't know what I was doing," Melissa said.

The second part was just natural curiosity.

"Who wouldn't want to know more?" she said.

Eventually, Melissa said she persevered and Lockett spilled her secret.

Melissa then convinced Lockett to let Melissa talk to a friend who knew how to sound credible. Melissa knew several others from working years ago at a gas station in Palatine.

Although Lockett OK'd the contact, she still specified she had to remain anonymous.

Melissa pushed for more information. She believed her friend, but she knew she had to sound credible to police, she said.

"I kept asking her questions so that I could confirm it in my own mind... I needed details I needed to know," Melissa said.

"She told me she couldn't remember all of it. But she said, you know, the kid threw me up french fries," Melissa said.

The fact, that one of the victims had thrown up french fries after being shot, would end up being key. Lockett later provided Palatine police Sgt. Bill King said at a news conference when the arrests were announced.

Melissa asked for even more details.

---



**Anne Lockett**

**Eileen Bakalla**

**Jose Luna**

---

between brownless a police officer and a detective, and after a night of no sleep, there was an anti-climax feeling to it.

Melissa heard almost nothing from police.

She also was afraid, having just played an ancillary role in a brutal murder case, and took a few pretautions.

"As soon as we called the police that first night, we (Melissa and her roommate) were in our home, locking doors constantly. Even when we were home, windows were locked. Usually we just leave the windows in the house open.

Two, perhaps three weeks went by, and Melissa began to wonder if they were being taken seriously. While she knew her officer-friend believed her, she thinks the detective talked to was skeptical.

"They have had about 15,000 tips about this thing, but nothing (had happened) on ours. I was convinced they had received hundreds of phone calls about it, and I'm sure he thought I was just another tip that would lead him nowhere.

Actually, it was tied No. 4,862 in the case.

And if police were skeptical at first, it became apparent two of the three workers agreed with the way she works seriously.

That's when Palatine Police Chief John Koziol showed up on her doorstep one evening.

He went with Cook County Sheriff's police Commander John Robertson and Scott Cassidy, an assistant Cook County state's attorney who is the head of the county's cold case unit.

The three questioned Melissa intently, making her repeat the entire story over and over again in detail.

"Those guys were on me the ball," she said. They asked me to call her I felt I shouldn't do it.

She wasn't answering the phone.

They were going to drive in Anne's heart that night, and when they asked me. It's like 9 o'clock at night, and it's a three-hour drive. They're like, 'Not a problem!'"

The intensity of the investigations

---

## The waiting

And then the wait began.

After a night of announcement, upheaval, after phone calls of urgent negotiation after setting up an interview with

---

wanted to come forward. She wanted to get the message to the Palatine police department, and she didn't want the murderers to shift for this information so it would be taken seriously so it wouldn't be raised over like an unreliable source.

Brown's bottom line is, she did come forward," Goff said. "Knowing Anne, if she wanted to remain anonymous, it was because she didn't want the notoriety. It was more driven by that fact. She didn't want the attention."

He also answered questions about reward money in regards to Anne.

Doesn't have put up an $86,000 reward in the event of a conviction. Some victims' family members have resented the decision and Bakalla getting any of it.

"We touched on the money. She said she's not really concerned," Goff said.

"Anne was not a concern when she came forward. That's something, she figures, once everything is said and done, we'll see what happen. She was never motivated

---



The stark image of the Brown's Chicken & Pasta Restaurant in Palatine shortly after the discovery of seven slain employees in January 1993. Earlier this year, police charged two men in the killings after a tipster led them to a key witness.

THANK YOU PALATINE POLICE

---

The father of one of the seven victims in the Brown's murders wanted to let Palatine police know how he felt about their work on the case earlier this year with this sign on a fence at Benton and Northwest Highway.

the source had to give up all this information, to get out of another charge. Meaning me — I'd been arrested," she said.

The only arrest she's ever had, she said, was at age 17 for violating curfew. A check of local court records by the Daily Herald turned up nothing but a few traffic violations.

## The money

When she talk turns to the reward Melissa avoids absolutes. She acknowledges she thinks she played a "vital role" in bringing

---

## The hero?

Although Melissa believes she played an ancillary role in the arrests, she does not think of herself as a hero.

"I have a personal belief that most people would come forward," Melissa said.

That belief lies in the face of police's assertion that even people who knew the same basic information that Melissa did never came forward. In fact, even after one man said he, he's life. "Why did you come forward with this information? (said) anybody would have. And he said,

## Sur was wrong.

### The fear

After Lockett and Degonah split up in 1994, Melissa renewed the friendship with Lockett. However, they never became as close as they had been in childhood years.

That closeness kept Lockett from telling Melissa about how her life had come to be ruled by fear of Degonah. Lwhy hingkilhgly called Lockett, Melissa later found out.

Police have said Degonah's threats to kill Lockett if she talked were frequent...

What's more, Melissa said, Degonah kept reminding Lockett he knew where she lived...

**The Go-between**

A 12    93



### The money

### Arrests and aftermath

On Saturday, May 18, police announced the arrest of Degonah and Lana...

### Other perspectives

**Have A Meeting That Rocks!**

Why is Prairie Rock Brewing Company
The Best Place For Your
**Next Business Event**

• Beautiful Atrium & Semi-Private Areas
• Award Winning Cuisine • Entertainment on Staff
• Experienced Sales Staff

For More Information Call Our Sales
Office Today For Your Convenient Semi-

1385-A Meacham Rd.
Schaumburg, IL
(847) 605-9000 x23

127 So. Grove St.
Elgin, IL
(847) 622-8888 x23

www.prairierockbrewingcompany.com

— Daily Herald staff writers
Stamos Toomey and Trevor Seela
contributed to this report

Printe
тп: 23-MAY-2014 10:42          HAMILTON COUNTY SHERIFFS

FS33                                                            EXHIBIT 6
                                    * * * * *                      1 of 1

                                    C A P S

ENCY: 00               CALLS FOR SERVICE BY EVENT NUMBER

              Event Number: 200200013084     Date Reported: 05/16/2002
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
How Recvd: O    Actvty Cd: SERVE WARRANT
Name Type:                                            Report#:

                                    Per/Bus Name: 1105
House #: 0000000      Str:   106TH ST/US 421
City:                                                     Apt #:
                          St:      Zip:              Ph #: (   )   -
SSN:     -   -
                     Complainant Address: 106TH ST/US 421
Patrol: HAMILTON COUNTY SHERIFF DEPT      Grid: WEST CLAY TWP
nit Asgn: 1105
                                    Person Asgn: MILLIGAN, CARY J
Addl Unit Asgn: 1     Shift:
                                                Ent From: ACAD
Comp Taker: HORINE, RYAN
                              Dispatcher: HORINE, RYAN
ecv: 14:49:57     Disp: 14:50:56    Arr: 14:50:56    Clear: 15:38:34
esponse: SERVICE 2
                              Disposition: ASSISTANCE GIVEN
omments:

em 1: SERVING A ARREST WARRANT FOR MURDER

em 2: Call Initiated by Unit: Z1105

d Person: ROBERT, RAY F
                                    3rd Person:
th Person:
                                    Reportable:
ig State:          Make:
                                    Model:              Year:
lor:
                     Bus Name:
ice:     Sex:     No Occupants:       Probable Cause:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A 13

EXHIBIT 7
1 of 1

I JAMES DE GONSKI

AGREE TO COME WITH THE

PALATIVE POLICE BACK

TO PALATIVE, IL TO

ASSIST IN THEIR

INVESTIGATION.

SIGNED Jim Dejoril

DATE 5-16-02

TIME 3:37 P m

Palatine
police
William
King ▶

WITNESSES On # 11 (1537H

Palatine ▶
police
Dan
Briscoe
**NO**
Indiana
Law
Enforcement

A 14

EXHIBIT 8
1 of 1

## PALATINE POLICE DEPARTMENT

### PRISONER LOCK UP RECORD

Name __DEGORSKI, JAMES  E__  Cell Number __C 1__

#### PROPERTY INVENTORY

Money __28" +.37¢__ Jewelry _____
_____ Wallet & Contents _____ Knife _____ Belt _____ Shoes
_____ Handbag & Contents _____ Watch _____ Cigarettes _____ Lighter/Matches

Other __KEYS ON KEYCHAIN , BASEBALL CAP__

Inventory Officer __D. BRISCOE__  Owner's Signature X _____

#### RECEIPT OF PROPERTY

Owner's Signature X _____ Date __05/18/02__ Time __0840__
Releasing Officer __#003__ Date __05/18-02__ Time __0840__

#### MEAL RECORD

| DATE | TIME | MEAL CONTENT | INITIALS |
|------|------|--------------|----------|
| 5-17-02 | 2110 | BURGER FRIES COKE | (7 |
| 5-18-02 | 0600 | Donut/Coffee | m.c #213 |

#### TELEPHONE RECORD

| DATE | TIME | NATURE OF CALL | INITIALS |
|------|------|----------------|----------|

CI# __02-0504__

CF# __0200201__

A15  ATT# __8__

$E \times H I B I T$ 9
$1 \circ F 3$


## Chicago Tribune
— ONLINE EDITION —

http://www.chicagotribune.com/news/local/chi-browns052002-story,0,2196115.story

# 7 kept Brown's secret, cops say; One is expected to go before grand jury Monday

By Michael Higgins, Maurice Possley and Eric Ferkenhoff
Tribune staff reporters

May 20, 2002

A man who since 1998 knew who allegedly committed the Brown's Chicken & Pasta Restaurant slayings is expected to testify Monday before a Cook County grand jury, according to police sources, potentially adding more evidence to the case from a person who harbored the secret for years.

According to court documents and accounts given by police, at least eight people believed the two suspects now charged were responsible for the 1993 killings, yet only one called the police.

The failure of the others to come forward has angered members of the victims' families. Some voiced their frustration to police during a meeting after Saturday's news conference, questioning why criminal charges could not be brought against two women whom the suspects--Jim Degorski and Juan Luna--allegedly confessed to within 24 hours of the killings.

But so far, authorities have been unwilling even to criticize their long-reluctant witnesses, calling one a hero for her eventual cooperation. It's a decision fueled by legal considerations, including concerns about the statute of limitations, and the strategic need for testimony, experts said.

The grand jury testimony expected Monday is to come from the husband of one of the women, Eileen Bakalla, sources said.

The man learned about the suspects from Bakalla shortly before the couple got married in 1998, but believed he needed to keep the secret in order to preserve his marriage, a law-enforcement source said. The two are now estranged, and the husband gave a tearful statement to Palatine police Thursday.

Jack Rimland, president of the Illinois Association of Criminal Defense Lawyers, said Sunday that prosecutors are being careful how they portray the women who may be their star witnesses.

"They want these two young women to have the appearance that they weren't vicious, they weren't part of the scheme, they came forward because they were finally in a position where they could put aside their fears" of retribution, Rimland said. "That gives them a much cleaner

$A 16$



Exhibit 9

presentation."

The role of the women in helping police bring charges also raises questions about who will get the reward offered in the case, which stands at $86,000.

Anne Lockett, 26, now a student at Eastern Illinois University, got a full explanation of what happened that night from Degorski and Luna just days after the killings, police said. And when Luna, a former Brown's employee, was called in for a police interview, Lockett accompanied him after Degorski told Luna it would make him look more respectable to go with a woman, police said.

Lockett kept the secret for years but told a boyfriend and their roommate last fall, police said. The boyfriend and Lockett considered sending an anonymous letter to authorities but did not. The roommate did not call police. Lockett's mother and sister also eventually knew about suspects, police said. Finally, another woman whom Lockett had told contacted police, who persuaded Lockett to cooperate.

Bakalla, a classmate of the two men at Fremd High School in Palatine, learned about the killings even sooner than Lockett, authorities said. Bakalla met up with Degorski and Luna after the killings and drove them to her home in Elgin, where she saw the money they had taken from Brown's and received $50, police said. She learned of the killings a few hours later, police said.

The next day, Bakalla went with Degorski when he took Luna's car to a carwash and sprayed out the interior, police said. Later, Bakalla backed up Luna's alibi, telling police Luna was with her on the night of slayings, police said.

On Sunday, Diane Mennes, sister-in-law of victim Thomas Mennes, said those who knew about the slaying suspects yet said nothing should at least be fined for putting the families through years of torment. If Illinois law does not permit that, she said, the law should be changed. "[The delay] mattered," she said. "My husband [Jerry Mennes, Thomas' twin brother] was a very angry person for years. He'd watch murderers getting caught on the news and say, 'They can find those guys; why can't they find the people from the Brown's Chicken?'"

Even if prosecutors were inclined to press criminal charges against the women, they would have to jump several significant legal hurdles.

As in most states, Illinois law doesn't require people who know about a crime to go to the police, experts said. Doing nothing "may make you unable to look at yourself in the mirror, but it doesn't make you legally responsible," said Richard Kling, a defense lawyer and law professor at Chicago-Kent College of Law.

Witnesses who mislead the police, intentionally trying to throw them off the trail of a criminal, can be prosecuted for obstruction of justice. But Lockett's actions were ambiguous, experts said. She appeared with Luna at his interview but didn't make any statements to police. And she reported that her life was threatened.

A 17

88

Exhibit 9

"If you are just scared, I don't think they would prosecute somebody for obstruction of justice," said John Corkery, law professor at John Marshall Law School.

Bakalla is in a more tenuous situation, experts said. She did lie to police by providing Luna's alibi, according to authorities.

But even there, authorities must deal with Illinois' three-year statute of limitations on obstruction of justice. Authorities have said the statute may create a problem. Experts said that if Bakalla made false statements to police within the last three years about what she knew, then she could be charged.

Obstruction of justice carries a prison sentence of 1 to 3 years, with probation a possibility, experts said. That's a small prize when weighed against their testimony.

The reward was established within two weeks of the killing. Outstanding pledges could push it over $100,000, according to Palatine Mayor Rita Mullins.

Palatine officials say its too early to tell who might be entitled to it--the tipster who first alerted authorities to Lockett; Lockett herself, who worked with police to tape-record what authorities describe as an incriminating telephone conversation with Degorski; or someone else.

If there's a conviction, Police Chief John Koziol would recommend who should get the money.

*Tribune staff reporter John Keilman contributed to this report.*

*Copyright © 2007, Chicago Tribune*

A 18

84

EXHIBIT 10
1 of 5

**STATE OF ILLINOIS** )

) SS

COUNTY OF __WILL__ )

### AFFIDAVIT

I, __James Degorski__ being first duly sworn under oath depose and state that the foregoing is true and correct and made upon my personal knowledge and I am competent to testify thereto.

1) My name is James Degorski. I am currently incarcerated at Stateville Correction Center in Joliet, IL.

2) Had my Attorneys allowed me to testify I would have testified to the following facts.

3) I did not commit the murders at the Brown's Chicken restaurant on January 8, 1993 or any murder anywhere, ever; nor was I present at the restaurant when the murders took place. I had no part in the planning, execution, or covering up those crimes.

4) Besides telling Anne Locket that I was "Juan Luna's" Brown's Chicken former employee (Jan 8, 93) alibi, I never confessed to any involvement in the Brown's murders to Anne. I never called her on Jan. 9, 1993 to confess while she was in the psychiatric hospital. I never confessed to her in my "tiny bedroom" in the basement of my Mom's home on Jan. 26, 1993.

5) I did not begin "dating/hanging out daily" with Anne until March 16, 1993. I remember this date because I attended Jeff Smolens' funeral and Anne also attended. We went out afterwards, and began seeing each other - "hanging out" as she claimed we were since 1990 which is a lie, to bolster credibility into her story involving me in this crime.

6) In the summer of 1992, while dating Tracy Gavrilos, I remodeled my Mom's basement due to flood damage. As such, the "tiny bedroom," to which Anne referred to a Brown's murders confession with Juan Luna happening in, no longer existed on Jan. 26, 1993.

7) I never confessed any involvement in the Brown's murders to Anne by stating I had just "done something big"; I had absolutely NO involvement in the murders at Brown's.

8) In the wrong way, I abruptly broke up with Anne in August of 1994, which greatly upset her especially when I left on a camping trip that night with Angie Kroll instead.

9) Subsequent to August 1994, Anne periodically tried to contact me, calling and leaving messages on my Mom and Sisters' phone line, she wasn't afraid of me.

10) In August of 2000 I planned to move to Tucson, AZ to propose marriage to Jen Peters my longtime sweetheart. Around this time I contacted Anne to return some old photographs I had just found, from while we dated. During the course of conversation she was happy talking about Rich, Juan Luna, etc. but became furious when I told her WHO I wanted to marry; Jen used to go on hiking trips with us.

A19

11) At no time before or after January 8, 1993 did I ever threaten to harm Anne Lockett. The duration of our dating was accomplishing fun esteem building projects - fixing cars boats, electronics, etc - building decks, docks, and remodeling. She had severe temper and honesty issues which resulted in our breakup.

12) Between 9PM - 9:45 PM January 8, 1993, I was in the Crystal Lake, IL area when I called Eileen Bakalla at Jakes Pizza in Hoffman Estates, IL - I called from a payphone in Cry.Lk. not from inside Browns, and I never mentioned I did anything of something big to her. Because I was still in Cry. Lk. and because she was housesitting her friend's townhome in Elgin, IL she decided for us to meet at the Jewel Osco in Carpentersville, IL to leave Juan Luna car I was testdriving

13) I was driving co-defendant Juan Luna's black '89 Ford Tempo that day because he had dropped it off at my home that morning for (Free) repairs. His well known car wasn't in Palatine, Il, nor was I; between 9pm & 9-45pm, Jan.8, 1993

14) At or around 10:15 PM, I met with Eileen at the Jewel/Osco I was walking out with booze as Eileen pulled up - Luna wasn't with me but knew from a heated phone call earlier that he'll have to pick his car up at the C'Ville Jewel/Osco instead of Hoffman Estates Jakes Pizza as agreed

15) As Eileen and I were driving out of the parking lot on to Rt-25, Luna ran up to the car, banged on the window, and asked - begged to come along with us,

16) Eileen never had a reason to get out of her car and testified to the fact that she did not see any bloody green rubber gloves = as she lied about in Luna's trial to seeing "somewhere in Luna's car".

17) Luna came with us to the townhome that night. Allowed only because the homeowners were in Florida on vacation, which is why Eileen needed to be there more so for the hyper cats than housesit; she could not sleepover anywhere.

18) There was no Brown's robbery talk or money counting on the livingroom floor, as Eileen testified at Luna's trial; completely contradicted by her uncomfortable testimony at my trial of counting robbery money on the floor of a upstairs bedroom, there simply was no robbery talk or robbery money counting, all a lie.

19) At 12-1AM Luna and I left, Eileen dropped us off down the street at the Carpentersville Jewel/Osco, Luna dropped me off at my home 1 mile from his in Hoffman Estates; Eileen went back to the townhome so. the cats don't get bored and tear up the house.... There was absolutely no "confession to (any) murder passing by Browns on the way to my home"; Eileen didn't drive me home. My Public Defenders failed to confront this, furthermore did not use the map Exhibit having her locate where I lived in relation to Luna, how far away her townhome was and how close it was to the Jewel/Osco, related Crystal Lake where she knew I was coming from, in relation to Jake's Pizza, and way out of the way Palatine Browns Chicken.

20) I never confessed to any involvement in the Browns murders to Eileen. There was absolutely no confession passing by Browns at 1AM January 9 1993; in fact the crime scene was not discovered at this time to see ambulances and police cars surrounding the Browns, once again my Attorneys didn't confront these lies against me.

A 20

21) I **never** brought Lunas or anyones car, to an outdoor or indoor carwash in Streamwood or anywhere on January 9, 1993 with Eileen or without. I **never** pressure washed the interior (or exterior) of Lunas' car on Jan 9, 93, or ever. The weather was 28° degrees on Jan 9, 93, that isn't even factoring in the wind chill! It would have been foolish and next to impossible detail a cars interior/exterior as Eileen testified to me destroying evidence on Lunas red interior Jan 9 '93 at a coin operated do it yourself car wash. First-I had a letter from Ford Mo.Co. saying red wasn't an option for Lunas' 89 Tempo. Second-Eileen and Cops didn't know I still had do it myself access to MJM Auto Polishing heated & fully stocked auto detail shop, I was friends with the owner. Lastly - 28° degrees would have probably froze the windows doors and locks, plus steam and ice would have formed on the electronics causing a stall and hard restart of his car. This highly incriminating lie didn't happen either. My Attorneys didn't fully confront her as promised.

22) I was illegally arrested at 3:30 pm May 16 2002 in my Zionsville, IN work parking lot, by Palatine Police, observed/witnessed by Indiana Sheriff and State Police.

23) I was surrounded and blocked in from the back, and street blocked in front as I was moving my tools from work van to personal truck as I do everyday, except this time I was bum rushed by law enforcement, who at first allowed me to continue talk/moving my tools. Once done I was told I'm not leaving in my truck turn around and put my hands on my trunk bed and rough frisked head to toe, before lead to their police car as police said they'll shoot me. I didn't consent to return to Palatine, IL on May 16, 2002 I was arrested "as my coworker described to other coworker ed "arrested in the parking lot." It was always the intentions of Palatine Police to arrest me - as proven in the Hamilton County Sheriffs' calls for service dispatcher report, Palatine Police claim they had a warrant for my arrest; **as they also told me, yet no warrant existed.**

24) I was surrounded by 3 teams of Law Enforcement Officers that lead me to the police car yet none of the Officers on the 2 Indiana teams wanted to sign as a "witness" to my arrest, they all refused. King said I was under arrest "at my truck"

25) In the back of the police car I was forced to sign a notepad which they now call a consent to travel form - if I consented, how were they "lost" as they testified; we were in **my** work parking lot, though they say they "needed to get directions we were absolutely lost!"

26) At my arrest, I was forced to leave behind my **truck** that held thousands of dollars worth of tools; some inherited from my Grandpa - IF I wasn't in fact arrested I wouldn't have called and had them picked up, nevertheless I wasn't free to use any phone until I got to Cook County Jail days later; I was forced to leave behind my cell phone at my truck along with medications and other personal belongings!

27) I wasn't free to leave, I never felt as though I had a choice whether or not to go with Palatine Police. I believed I was "arrested, before they told me they had a warrant, I was "under arrest, put your hands on the truck" from the start.

28) I was taken to Streamwood, IL police station where I was held by Palatine police against my will, in complete incommunicado from my concerned family. Whom I knew was stressing when I didn't show up for dinner, and didn't come home that night, no typical message on the answering machine after work laying out my evening plans, and invite where to meet us. They wouldn't let me order food, or my **medicine**, nor let me see a judge, or release me.

Exhibit/D

29) In November, 1995 Palatine Police asked me if Juan Luna could have been with me at 9-10 pm Jan 8 1993. I told them I didn't remember what I did even 2 weeks ago Fri much less 2 years ago. Given some details and Browns murders, I told them, yes he couldve been with me although he is lazy as hell, doesn't work on cars, he wasn't working on cars with me all day. NO, I never knew him to be dating any Eileen, infact the only Eileen I knew was my friend, there is no way he was party hoppin all night with me, screwing her. These police left vasifying this with my friend Eileen... I again repeated this over & over dwring the May 16-18 2002 interrogation. Detective King FAILED TO REINVESTIGATE Juan Luna as the Rookie Officer suggested; this isn't my fault he wasn't arrested in 1995!... Once given details of "Carpentersville Jewel Osco" in May 2002 I was able to be much more specific. I remember Juan dumping off his car at my home shop for repairs to fix a door & window from a crash and he didn't help me at all, never showing up; so I took his car on a long test drive when done, dumping it off far away in Carpentersville. He wasn't with me all day.

30) Out of the blue Anne Lockett called me high as a kite on May 15, 2002 concerning Browns Chicken. I told her about being Lunas alibi on the phone August 2000 so I wasn't surprised, Luna was her very close friend Jan 8 1993 along with many forme-Browns Chicken employees; including Martin Blake (EXHIBIT E Daily Herald article Mon. 9-23-02 "Tipster In Browns Chicken murder case finally speaks out?"). Furthermore I know she drinks & is ill, in addition to this one month earlier validating my alibi for Luna, I did mention her name (all Ex-girlfriends) to the police. I told her to call the police and tell them the truth, something she has yet to do.

31) I was up late & awake early for work — then arrested after my construction job 5-16-02. I was exhausted and sleep deprived in Streamwood & later Palatine police stations, not allowed allergy & asthma medications - suffocating for days, no end in site. Went to Hosp. 5-18-02 1 AM

32) They kept using toilet, phone, medicine, wallet/corporate credit cards, inherited tools, the time/date, water, food, and so on as bartering chips to repeat their stories/crime details of Browns murders. In a nonstop tag team they kept cutting me off feeding me lies to repeat about crime details I know nothing about; over & over, wanting me to repeat it word for word, and on video.

33) They proved to me January 8, 1993 murders was the day we (I) dropped (dumped) Juans car off at the Carpentersville, IL (ghetto) Jewel Osco — In turn I was able to be much more specific infuriating King telling them the truth, of his shotty police work, I refused to lie implicating Luna, nor lie against myself, infuriating them further.

34) I believed their threats, starting at my truck (May 16TH) in Indiana. I kept asking to see a Judge or be released. I kept demanding a phone to call my Attorneys Cary Collins & John Noble which I knew both as friends since 1987, using both as my non-smartass mouth piece over the years. I offered to write/sign a statement, & make more videos, though it made them madder each time, not respecting my rights; I had no Constitutional rights. I kept remaining silent after demanding a Judge or be released — the torture just continued! Including physical feet stepped on, shoulder grab/shove

35) Palatine Police coerced a false confession out of me, where I repeat their details mixed with more lies in order to use the phone. The video guy & equipment was there from the beginning recording, but only turned in a 4 min. video. However they NEVER let me use the phone, or see a Rolling Meadows Judge I was begging for.

36) My Attorneys stopped a Civil deposition to save all my testimony for trial. Gag-order - said if I talk to The Press I can't testify. Then wouldn't let me testify at my Quash illegal arrest, and Suppress statement/quotes of me motions in 2007, in order to testify at trial...

A22

37) In trial I was told I will be testifying last. My Mom etc. were confused by conversations with my Attorneys that I didn't want to testify, contrarily Attorneys tell me, I am, and they are ready. However with many of my witnesses left to still testify, the State asks, and my Attorney answers "Yes, defense will rest tomorrow". That night my Mom says my Attorneys want her to convince me not to testify - as details of family, private matters will be exposed. As I believed my Family felt I need to testify. The morning of September 22, 2009 my Attorneys told me they aren't ready for me to testify, confusing me, saying the rest of the many witnesses will be called for rebuttal, and then Anne, Eileen, Police, Hanger, Hines, McHale, etc. will be called back up on the stand for impeachment; I still wanted to testify of what nobody else could! We argued about it all morning until going into the courtroom, they had the last word I'm not testifying, they aren't ready I don't have a choice we need to rest today so we can call these rebuttal witnesses. I was vaguely admonished twice (9-22-09/9-25-09) given the wrong advice. The 9-29-09 closing arguments happened; right when I thought the rebuttal witnesses (long list!) were going to be called, the Judge sent my (non-pros) Jurors in back to deliberate! I looked over at my Family mind blown, I still had no rights, not even in a courtroom.

38) Had I had the right to testify I would've gone home pretrial, trial at the latest. My accusers hasn't been confronted, I found out after trial witnesses weren't investigated for my defense; only mitigation. I would have testified to more than described in this affidavit, furthermore completely impeaching Anne Lockett, Eileen Bukalla, Police, Michael McHale, Walter Hanger, Alicia Hines, and so forth. Instead here I sit in prison appealing for the last 13 years.

39) The Palatine police desperate for lies against me - took a conversation with my coworker out of context as if I confessed to the Browns murders asking if murderers go to heaven, infact I asked if "serial child molestors & serial rapist" will go to heaven - key word "serial". This was right after he preached to me a sermon - including he isn't allowed around his daughter - pity party, along with his brother wasn't going to heaven, then was, then wasn't, then was now that he is in prison for molesting kids. This was minutes after meeting him. This was me being a smartass - quoting the Holy Bible to him; ruining his sermon, at work.

40) There was no Browns Chicken confession, or any talk about any murder - I could barely speak with these injuries that had me in the Cook Co. Jail's dispensary, muchless joke around with her chatting with her as she described. There was no confession to nurse A. Hines.

41) Luna tells me he's innocent... Or is too cowardace to name who the 2nd DNA is.

**Pursuant to 28USC 1746, 18USC 1621 or 735 ILCS 5/109, I declare, under the penalty of perjury, that I am a named party in the above action, that I have read the above documents, and that information contained therein is true and correct to the best of my knowledge.**

DATE 2-24-23

/s/ James Degorski

AFFIANT James Degorski    IDOC# M09414

OFFICIAL SEAL
JANIS R GARRISON-ELMORE
NOTARY PUBLIC, STATE OF ILLINOIS
COOK COUNTY
MY COMMISSION EXPIRES 11/04/2024

Stateville    **CORRECTIONAL CENTER**

PO BOX 112 Joliet, IL 60434

Page 5

A 23

For more facts check out **jamesdegorski.com**



(I) Post

EXHIBIT 11
1 of 25

Judgment

June 13 2022

2022 IL App (1st) 180192-U
No. 1-18-0192
Order filed June 13, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | |
| v. | No. 02 CR 15430 |
| JAMES DEGORSKI, | The Honorable Vincent Michael Gaughan, Judge, presiding. |
| Defendant-Appellant. | |

PRESIDING JUSTICE HYMAN delivered the judgment of the court.
Justices Walker and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the second-stage dismissal of Degorski's postconviction petition because he failed to make a substantial showing that the State violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and he failed to make a substantial showing that any of his trial or appellate counsels' many alleged deficiencies prejudiced him.

¶ 2    The State charged James Degorski and co-defendant, Juan Luna with multiple counts of first degree murder for the 1993 killings of seven employees at a Brown's Chicken restaurant in Palatine, Illinois. Following a severed jury trial, a jury found Degorski guilty, and he received a sentence of natural life imprisonment.

A-24

No. 1-18-0192

¶ 3    After direct appeal where this court affirmed the convictions, Degorski petitioned for postconviction relief. The trial court dismissed the petition at the second stage. Degorski now appeals, arguing: (i) the State violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence that a key witness had a monetary motive to testify, and (ii) his trial and appellate counsels were ineffective on several grounds.

¶ 4    We do not agree with any of Degorski's arguments. A common theme runs through our decision: Degorski has failed, either as a matter of law or due to insufficient factual support, to make a substantial showing that the claimed errors—if they are errors—impacted the outcome of his trial. Under *Brady*, he failed to show that the evidence the State withheld was material to his guilt or innocence; as to his ineffective assistance claims, he failed to show that counsels' allegedly deficient actions prejudiced him. We affirm.

¶ 5                                Background

¶ 6    We recited the underlying facts in our opinion from Degorski's direct appeal. *People v. Degorski*, 2013 IL App (1st) 100580. During Degorski's trial, the parties presented multiple witnesses and exhibits. A jury found Degorski guilty and eligible for the death penalty but instead sentenced him to natural life in prison. We limit our description of the facts to those that relate to this appeal.

¶ 7                             *Motion to Suppress*

¶ 8    Evidence at a hearing on Degorski's pretrial motion to quash arrest showed that on May 16, 2002, Palatine police officers, who had been surveilling Degorski for several days, went to Indiana to "pickup" Degorski for questioning. See *People v. Degorski*, 382 Ill. App. 3d 135, 138 (2008). The police stated that they did not have an arrest warrant. Still, they asked Degorski if he

A-25

No. 1-18-0192

would voluntarily accompany them to Illinois for questioning. *Id.* Degorski agreed, and the officers took him to the Streamwood police station for interrogation. *Id.* The officers *Mirandized* Degorski and questioned him for about 10 hours, accompanied by an Assistant State's Attorney. Ultimately, Degorski admitted his involvement in the murders. *Id.* at 138-139. The State used his oral, unrecorded statements against him at trial.

¶ 9    At the hearing, both former Assistant State's Attorney Michael McHale and Palatine police sergeant Bill King testified that Degorski was not subjected to any coercive measures and freely and voluntarily spoke to them. They repeatedly gave him opportunities to eat, sleep, and use the washroom. McHale testified that Degorski told him he was treated well by the officers. Chief Koziol testified that he did not have any contact with Degorski and denied grabbing or squeezing Degorski's shoulders. Based on this evidence, the trial court ruled that Degorski's oral statements were voluntarily made, but his videotaped statement would be suppressed due to a *Miranda* violation. The State appealed, and this court reversed and remanded for the remainder of the trial proceedings. *Id.* at 147-48.

¶ 10                                              *Trial Evidence*

¶ 11    On the night of the murders, January 8, 1993, Brown's Chicken closed at 9:00 p.m. Shortly after closing time, seven employees were shot to death. The restaurant's trash cans were empty except for the remains of a four-piece chicken meal, a paper cup and napkins, and a cash register receipt. The cash register appeared to have been closed and reopened to sell a meal at 9:08 p.m. The receipt was consistent with the meal discovered in the trash can. A fingerprint found on a paper napkin matched codefendant Luna's fingerprint. DNA from one of the chicken bones matched Luna's DNA profile and excluded Degorski as a contributor to the sample.

No. 1-18-0192

¶ 12    In January 1993, the Village of Palatine passed a resolution to establish a fund for anyone with information leading to the arrest and conviction of whomever committed the murders. The fund existed until Degorski's and Luna's convictions, Luna in 2007 and Degorski in 2009.

¶ 13    At Degorski's trial, Eileen Bakalla testified that she was friends with Degorski and Luna. On the night of the murders, she received a telephone call from Degorski, asking her to meet them in a grocery store parking lot in Carpentersville, Illinois. Degorski said they had "done something big." Bakalla left work at 9:30 p.m. When she met up with Luna and Degorski, she noticed green rubber gloves in the back seat of Luna's car. Bakalla drove them to her townhouse. On the way, she asked about a canvas money bag they had with them. They told her that it contained money they had taken from Brown's Chicken.

¶ 14    While at Bakalla's home, Degorski and Luna split up the money. Degorski gave Bakalla $50 he owed her. The three smoked marijuana and stayed for a few hours. Bakalla then dropped Luna at his car. Bakalla and Degorski then drove past Brown's Chicken, where they saw ambulances and squad cars in the parking lot. Degorski told her that Luna had gone "ballistic and started killing people," "slit the owner's throat from ear to ear," and "put the rest of the employees in the cooler [and] in the freezer." Degorski said Luna shot four people in the cooler and handed the gun to him, and he shot two people in the freezer. They wore gloves, mopped the floor afterward, and threw the gun in the Fox River. Bakalla and Degorski went to Degorski's home, where they spent the night. The following day, they cleaned Luna's car at a carwash.

¶ 15    Bakalla testified she did not tell police about the murders until they approached her on May 15, 2002. Bakalla did tell her husband, Keith Abel, about the murders before their 1998

-✗- A 27

No. 1-18-0192

wedding. Abel testified that, in 1998, Bakalla told him that Degorski and Luna had done "something big" and mentioned Brown's Chicken.

¶ 16    Anne Lockett testified that she had dated Degorski and remained friends with him. She was also friends with Luna and Bakalla. In 1992 and 1993, Lockett frequently abused drugs and alcohol and twice attempted suicide. On January 9, 1993, she was hospitalized after a failed attempt, during which time she received a telephone call from Degorski, telling her to watch the news that night because he had "done something big." The lead story that night was about the murders.

¶ 17    Lockett left the hospital on January 25 and later met up with Degorski and Luna at Degorski's home. Degorski told her about the Brown's Chicken robbery and said they had already told Bakalla because they had to use her as an alibi. Degorski and Luna told Lockett that on the night of the murders they drove Luna's car to the restaurant. They placed a wedge behind the back door to prevent the employees' escape. Luna ordered a chicken dinner, upsetting Degorski, who was worried that Luna would leave fingerprints. Luna finished the meal and put the chicken bones in the restaurant garbage can. Luna and Degorski then went into the bathroom and put on gloves.

¶ 18    When they came out of the bathroom, Degorski and Luna crowded the employees into the freezer and cooler and shot them. Luna slit one woman's throat. Degorski and Luna then mopped the floor and wiped the area down to remove fingerprints. They later threw their clothes into a dumpster and threw the gun into the Fox River.

¶ 19    Degorski and Luna explained to Lockett that they had chosen Brown's Chicken because Luna had worked there. They also told Lockett that Luna wanted to see what it was like to kill someone, and Degorski agreed to help. They said they would kill Lockett if she told anyone.

¶ 20    Lockett also testified that Degorski owned a silver .38-caliber revolver that he kept in his bedroom, but she never saw it after her hospital discharge.

-8-    A 38

No. 1-18-0192

¶ 21    Degorski did not testify. The trial judge questioned Degorski:

> THE COURT: Mr. Degorski, I know your attorneys have explained to you that you have a right to testify in this case. They told you that?
>
> DEGORSKI: Yes.
>
> THE COURT: You heard me during voir dire examination say that anybody accused of a crime has two Constitutional rights. One is to testify and if they testify, their testimony would be judged as anybody else's; is that correct?
>
> DEGORSKI: Yes.
>
> THE COURT: All right. And then on the other flip side of that, of the Constitutional issue, is that you have a right not to testify; do you understand that, Mr. Degorski?
>
> DEGORSKI: Yes.
>
> THE COURT: And if you decide not to testify, then no inference can be drawn from your silence and I will instruct the jury as to that?
>
> DEGORSKI: Yes."

This exchange followed:

> "THE COURT: After consulting with your attorneys and knowing [these] Constitutional protections that you have, what is your desire about testifying?
>
> DEGORSKI: They said there's no need.
>
> THE COURT: I'm sorry. What do you say?
>
> DEGORSKI: No."

¶ 22    The jury found Degorski guilty of seven counts of murder, and he was sentenced to natural life imprisonment. In 2010, Lockett and a friend shared the $100,000 reward offered by the Village of Palatine because they "provided information that directly led to the conviction of Juan Luna and James Degorski."

A-29

No. 1-18-0192

¶ 23                                    *Direct Appeal*

¶ 24    On direct appeal, Degorski argued he was denied a fair trial because: (i) the trial court

allowed the testimony of one of the State's witnesses, a former assistant state's attorney, that he

believed Degorski's testimony was reliable—at the time of trial he was a Cook County circuit

court judge; and  (ii) Degorski was prejudiced when the jury viewed a video of the removal of

bodies from the walk-in freezer in the restaurant. See *id.* ¶ 48. This court affirmed, finding the

prejudicial effect of the witness's status as a judge did not outweigh its probative value, and any

abuse of discretion was harmless. *Id.* ¶ 65. Nor did the trial court abuse its discretion in admitting

the video because its probative value outweighed any prejudice. Even if the video had been

erroneously admitted, that error would be harmless beyond a reasonable doubt. *Id.* ¶¶ 102-103. We

noted that "[e]ven though no physical evidence connected Degorski to the murders, both DNA and

fingerprint evidence inculpated Luna, [who was] Degorski's best friend with whom Degorski was

seen almost immediately after the offense." *Id.* ¶ 103. In addition to his relationship with Luna,

Degorski's conviction rested on his statements to McHale, King, Lockett, and Bakalla. *Id.*

¶ 25                                *Postconviction Petition*

¶ 26    Degorski, through counsel, filed a postconviction petition and, after amending it twice,

raised two sets of claims. First, he alleged the State improperly withheld material evidence in

violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Degorski claimed the State failed to disclose

that Lockett "was promised and received $100,000 in reward money in exchange for her testimony

against Degorski." His petition alleged the Village of Palatine established a reward fund shortly

after the murders, publicized on a local billboard. Several articles in local publications, including

the *Daily Herald* and the *Chicago Tribune*, discussed the reward money and had speculated that

*x̶-* A 30

No. 1-18-0192

Lockett may have been considered as a recipient. Indeed, the petition alleges that police "Sergeant Kozial assured Lockett that if she testified well and her testimony produced a conviction, she would receive the money." Degorski attached an affidavit from Richard James Bilik, an old romantic partner of Lockett's, attesting that "it seemed like [Lockett] was very interested in collecting on the substantial reward money and was willing to implicate anyone."

¶ 27    A resolution from the Village of Palatine and an accompanying monetary statement, also attached to the petition, showed that Lockett eventually received $49,064.50 for "provid[ing] information that directly led to the conviction of *** James Degorski."

¶ 28    Degorski further alleged that his counsel was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for several reasons: (i) failing to investigate and present evidence of Lockett's monetary incentive to testify, (ii) failing to impeach Lockett on other matters affecting her credibility, (iii) failing to present evidence supporting Degorski's pretrial motion to suppress evidence, (iv) failing to object to, and later challenge on appeal, DNA evidence showing Luna's DNA on a chicken bone found at the scene, and (v) improperly preventing Degorski from exercising his right to testify at trial.

¶ 29    The State moved to dismiss Degorski's petition. As to the *Brady* claim, the State denied the existence of monetary promises made to Lockett in exchange for her testimony, emphasizing that any award came from the Village of Palatine and was contingent on a successful trial. The State also focused on the trial evidence. It argued, even if it had failed to tender information about Lockett's monetary motive to testify, that information would not have changed the outcome of the trial. Turning to Degorski's claims of ineffective assistance of counsel, the State largely did not dispute their factual basis. Instead, the State chalked each of his claims up to an unassailable

No. 1-18-0192

trial strategy. It repeated its argument that the outcome of trial would not have been different even if counsel had performed in the ways Degorski argued they should have.

¶ 30    The trial court dismissed Degorski's petition without an evidentiary hearing, finding "there is no *Brady* violation. I also find that there was no ineffective assistance of counsel and my final finding is that there is no substantial showing of a violation of constitutional right to demand relief under the Postconviction Act."

¶ 31                                    Analysis

¶ 32    In this court, Degorski raises the same claims arguing each should have advanced to a third stage evidentiary hearing; the State echoes the same rejoinders it made in the trial court. Although we are persuaded by the State's analysis, both parties at oral argument took positions requiring us to clarify the standard we use to evaluate second-stage dismissals of postconviction petitions.

¶ 33    The Postconviction Hearing Act requires a third-stage evidentiary hearing "whenever the petitioner makes a substantial showing of a constitutional violation." *People v. Coleman*, 183 Ill. 2d 366, 381 (1998). When determining whether a petition should advance to the third stage, the trial court makes no factual findings and considers all well-pled factual allegations true. *Id.* at 380-81. At this stage, we still construe all claims liberally in Degorski's favor. *Id.* at 382. Here we offer our first clarification. At oral argument, Degorski's counsel urged us to find that our obligation to take the claims in his petition as true alleviated his burden to provide evidence supporting those claims, including his own affidavit. Though our second-stage review is deferential to the pleadings, Degorski asks us to go further than Illinois Supreme Court precedent allows.

¶ 34    Starting in *People v. Collins*, 202 Ill. 2d 59, (2002), the supreme court distinguished between verification affidavits required by section 122-1 of the Act and evidentiary affidavits

-9- A 32

required by section 122-2 of the Act. *Id.* at 66-67. The former serves only to attest that the pleading is made in good faith; the latter, on the other hand, provides evidence that the allegations in the petition are capable of independent corroboration. *Id.* at 67. Even at the first stage, failure to attach evidentiary affidavits dooms a postconviction petition. *Id.* at 69. The supreme court has softened the harsh edges of its decision in *Collins*, but never in a way that excuses a postconviction petitioner from providing his or her *own* evidentiary affidavit. *E.g., People v. Hall*, 217 Ill. 2d 324, 333 (2005) (where defendant provided his own affidavit, and only other affidavit that could support his claim was trial counsel's, failure to attach additional affidavit would be excused for ineffective assistance claim); *People v. Delton*, 227 Ill. 2d 247, 258 (2008) (chastising defendant for failing to attach evidentiary affidavit where contents would have been within defendant's knowledge); *People v. Allen*, 2015 IL 113135, ¶ 34 (forgiving failure to notarize evidentiary affidavit where attached evidence in form of affidavit was "capable of independent corroboration"). Our appellate court has similarly forgiven the failure to attach affidavits where the underlying record supports the petitioner's claims. *E.g,. People v. Hanks*, 335 Ill. App. 3d 894, 898-99 (2002).

¶ 35    We recognize a tension between a requirement that a petitioner supply, at minimum, his or her own evidentiary affidavit with the supreme court's repeated admonishments that we take the allegations in the petition as true at the first and second stages. *E.g., People v. Sanders*, 2016 IL 118123, ¶ 31. But the legal inquiry on review from second stage dismissals always includes our "assessment of the allegations of the petition *and* supporting documentation," if there is any. See *id.* (Emphasis added). To the extent tension remains, the supreme court must resolve it. Without more explicit guidance, we see no basis on which to excuse Degorski, who was represented by

No. 1-18-0192

counsel at the second stage, from including his evidentiary affidavit addressing the claims for which his testimony would be relevant.

¶ 36 We would be remiss if we did not address one of the State's pervasive misstatements of our second-stage review standards. The state repeatedly—at oral argument in particular—argued that many of Degorski's claims were "positively rebutted by the record" simply because they are based on factual allegations inconsistent with testimony or other evidence in the original trial record. In *People v. Robinson*, 2020 IL 123849, the supreme court clarified that new evidence is only positively rebutted by the record where "no factfinder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* ¶ 60. The court in *Sanders* offered a concrete example: a witness's recantation testimony explaining the witness shot a murder victim once is irreconcilable with forensic testimony that the victim was shot twice. *Sanders*, 2016 IL 118123, ¶ 48. Though *Sanders* and *Robinson* arose in a different procedural posture, we see no reason their definition of "positively rebutted by the record" fails to apply here. Were it any other way, no postconviction claim would ever succeed because, by definition, such claims are inconsistent with the trial record.

¶ 37 With these clarifications we proceed to the merits, reviewing the trial court's second-stage dismissal of Degorski's postconviction petition *de novo. People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 25.

¶ 38                             Brady *Violation & Related Ineffective Assistance Claim*

¶ 39 Degorski first argues that the State violated its obligation to disclose favorable evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding "Lockett's financial incentive to testify against [him]." He argues Lockett "expected to receive" the reward money set aside by the

¶. A 34

No. 1-18-0192

Village of Palatine. The State responds that it did not withhold any evidence of Lockett's motive to testify because no monetary "promise" ever existed. And, says the State, even if someone had promised Lockett the reward money in exchange for her testimony, the evidence was "overwhelming" such that her motive was not material evidence. Though we agree Degorski made a substantial showing that the evidence of Lockett's monetary motive to testify was favorable impeachment evidence that the State failed to disclose, it was not material to his guilt. For similar reasons, he suffered no prejudice from his counsel's failure to discover Lockett's monetary motive and cross-examine her about it. Degorski's *Brady* claim and related ineffective assistance of counsel claim fail.

¶ 40    Under *Brady*, prosecutors must disclose all evidence favorable to the accused. *People v. Beaman*, 229 Ill. 2d 56, 73 (2008). The prosecutor's obligation extends to "evidence known to police investigators" or "other government actors." *Id.* To succeed on a *Brady* claim, a defendant must show three things: (i) the undisclosed evidence is favorable to the accused as either exculpatory or impeaching, (ii) the State withheld the evidence from the accused, either intentionally or inadvertently, and (iii) the evidence was material to the accused's guilt or punishment. *Id.*, at 73-74. The State, in some fashion, challenges all three elements of Degorski's *Brady* claim.

¶ 41    First, the State argues that any monetary benefit Lockett may have received was not "undisclosed." The State points to the exhibits attached to Degorski's petition showing news articles about the award and speculation that Lockett might receive it as evidence that any information about the award was public at the time of trial. The State then argues there was no

No. 1-18-0192

evidence of any "promise" to Lockett, meaning nothing left for the State to disclose. We find this part of the State's argument foreclosed by Degorski's pleadings.

¶ 42    Degorski's petition alleges that Sergeant Kozial of the Palatine Police Department, "assured Lockett that if she testified well and her testimony produced a conviction, she would receive the money." Though we have no affidavits from any of the officers, ~~James~~ Rich Bilik's affidavit explains that Lockett knew that "whoever came forward with information [about the Brown's Chicken murders] would be entitled to reward money." He also averred that "it seemed like Anne [Lockett] was very interested in collecting on the substantial reward money." At this stage, we take these allegations as true and construe them liberally. *Coleman*, 183 Ill. 2d at 380-82. Degorski's allegation that Sergeant Kozial promised Lockett the reward money is supported by Bilik's affidavit explaining that Lockett expected to receive the reward money and was "willing to implicate anyone."

¶ 43    The State offers two counters to this conclusion: (i) the State's relationship with the trustees of the Palatine reward fund was too tenuous to impute the knowledge of any promise to the State, and (ii) Lockett's ultimate receipt of the reward was too tenuous at the time any alleged promise was made to support *Brady* relief. We find neither argument persuasive.

¶ 44    We agree with the State, as a general matter, that the connection between the agency possessing the allegedly exculpatory or impeaching information and the State's Attorney's Office must be sufficiently concrete to impute knowledge to the State. See, *e.g,. In re C.J.*, 166 Ill. 2d 264, 269-70 (finding relationship between State's Attorney's Office and Department of Children and Family Services investigators insufficient to attribute to State knowledge gained by DCFS). But based on the allegations in Degorski's petition, the relevant entity that promised the reward

-~~15~~-    A36

No. 1-18-0192

was the Palatine Police Department (through Sergeant Kozial), not the trustees of the reward fund. Moreover, as a matter of law, prosecutors are generally expected to know when the police involved in their case know of exculpatory evidence. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police"). The State does not challenge its connection to the Palatine Police Department for *Brady* purposes and we find the connection sufficient at least at this stage of postconviction proceedings.

¶ 45    We also find the State's concern about the remoteness of the connection between the alleged promise and the eventual payoff does not apply here. For *Brady* purposes, a promise that creates an "expectation[ ] of special favor *** in the mind of the witness" is enough to trigger disclosure obligations. *People v. Morales*, 2019 IL App (1st) 160225, ¶ 32 (quoting *People v. Triplett*, 108 Ill. 2d 463, 467 (1985)). Indeed, the conditional nature of the promise may only increase a witness's incentive to testify falsely. *Id.*, ¶ 27 (citing *United States v. Bagley*, 473 U.S. 667, 663 (1985)). The resolution creating the reward fund expressly conditions the reward on the Village of Palatine's satisfaction with the outcome of trial—the fund would only compensate a person who "provide[d] information that directly l[ed] to the arrest and conviction of the person or persons responsible for the murders." The existence of the promise made by Sergeant Kozial, its contingent nature created by the Village of Palatine, and Lockett's expectation that she would receive the award if she implicated someone constitutes impeaching testimony that the State did not disclose.

¶ 46    We turn, then, to the State's primary argument: even if it failed to disclose impeaching evidence, Lockett's monetary motive to testify against Degorski was not material to his conviction.

-14-    A37

Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *People v. Harris*, 206 Ill. 2d 293, 312 (2002). We ask not whether the remaining evidence was sufficient but whether the new favorable evidence could "put the whole case in such a different light as to undermine confidence in the verdict." *Id.* Evidence can be material even if only used for impeachment. *Id.*

¶ 47    We find the evidence of Lockett's monetary motive to testify would not have been material to Degorski's guilt or innocence. Even if impeaching Lockett would have caused the fact finder to discount her testimony entirely, Degorski confessed to three other witnesses: Eileen Bakalla, Officer King, and Assistant State's Attorney McHale. As we recounted in the direct appeal order, the confessions were largely consistent and provided detail beyond media coverage of the murders. See *Degorski*, 2013 IL App (1st) 100580, ¶¶ 10-11, 20-29. Degorski has not identified, and we cannot think of, a reason the damage to Lockett's credibility caused by her monetary motive to testify would impact the credibility of the remaining confessions. Our confidence in Lockett's testimony is shaken, but not our confidence in the verdict.

¶ 48    We reject Degorski's related claim of ineffective assistance of trial counsel for similar reasons. He argues counsel was ineffective for failing to impeach her, assuming counsel knew of Lockett's monetary interest in Degorski's conviction. To prevail on a claim of ineffective assistance, the defendant must meet the familiar *Strickland* standard by showing that (i) his or her counsel's performance was deficient, and (ii) counsel's deficient performance prejudiced him or her. *Strickland v. Washington*, 466 U.S. 668, 687, 697 (1984). Failure to satisfy either prong dooms a claim. *People v. Garcia*, 405 Ill. App. 3d 608, 620 (2010). We review claims of ineffective assistance of counsel *de novo. People v. Utley*, 2019 IL App (1st) 152112, ¶ 37.

-18-   A 38

No. 1-18-0192

¶ 49    Degorski has failed to make a substantial showing of *Strickland* prejudice. To show prejudice, there must be a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45. The only question is whether a not guilty verdict would have been reasonable, so counsel may be ineffective even if the chance of acquittal is "significantly less than 50 percent." *Id.* Even under that relatively low standard, Degorski's claim fails. Even if his counsel had significantly impeached Lockett and Bakalla to the point where a factfinder disregarded their testimony completely, Degorski confessed to police and prosecutors in multiple consistent statements relaying specific details of the crime. Degorski's allegations do not "undermine confidence in the outcome" of his trial, and, as a result, counsel was not ineffective for the alleged failure to investigate Lockett's monetary motive and cross-examine her about it at trial.

¶ 50                    *Other Ineffective Assistance of Trial Counsel Claims*

¶ 51    Degorski asserts ineffectiveness of trial counsel on several bases in addition to the *Brady* claim. Degorski argues he made a substantial showing of ineffective assistance of trial counsel based on trial counsel's failure to (i) to investigate and present evidence, unrelated to monetary motive, that would have undermined Lockett's credibility, (ii) to present evidence at the pretrial hearings on the motion to suppress statements showing officers arrested him without probable cause in Indiana, (iii) to present evidence at the hearing on the motion to suppress statements showing his confession was involuntary and coerced; (iv) to acquiesce in his testifying in his own behalf; and (v) to move to bar DNA evidence and appellate counsel's failure to raise the issue on direct appeal.

-16-    A 39

¶ 52    Again, to warrant third stage postconviction proceedings on a claim of ineffective assistance of counsel, Degorski must make a substantial showing that (i) his counsel's performance was deficient, and (ii) counsel's deficient performance prejudiced him. *Strickland*, 466 U.S. 668 at 687, 697. As we said before, failure to satisfy either prong dooms a claim. *Garcia*, 405 Ill. App. 3d at 620.

¶ 53                                  *Lockett's Credibility*

¶ 54    In addition to the ineffective assistance claim in relation to his *Brady* claim, Degorski asserts five reasons to conclude counsel was ineffective for failing to present evidence related to Lockett's credibility: (i) readily available evidence that Lockett could not receive phone calls at the hospital shows that Lockett's testimony that Degorski called her a few days after the murders was untrue; (ii) counsel failed to present testimony from Richard Bilik, Lockett's boyfriend at the time of the murders; (iii) had counsel conducted a reasonable investigation he would have learned that Lockett was "actively trying to pin the Brown's Chicken murders on someone so that she could claim the $100,000 reward established by the Village of Palatine"; (iv) counsel failed to present testimony from Degorski's mother Pat, who would have refuted "several" of Lockett's claims—*i.e.*, the basement bedroom Lockett described as the location where Degorski confessed to her in 1993 did not even exist in 1993 and Lockett's claim she was afraid of Degorski was false; (v) counsel failed to apprise the jury through cross-examination or third-party witness testimony that Lockett had a long a documented history of being dishonest.

¶ 55    We resolve these claims as we did Degorski's other ineffectiveness claim related to counsel's treatment of *Brady* evidence impeaching Lockett. Even assuming the evidence Degorski puts forward would have destroyed Lockett's credibility entirely, he confessed to several other

-88- A 40

No. 1-18-0192

people with detailed narratives of the crime; there is no reasonable probability the outcome of trial would have been different had counsel put this evidence before the jury. *Supra*, ¶ 51 (citing *Lucious*, 2016 IL App (1st) 141127, ¶ 45 (reciting standard for *Strickland* prejudice)).

¶ 56                                   *Evidence of Degorski's Unlawful Arrest*

¶ 57     Degorski argues trial counsel was ineffective for "fail[ing] to support Degorski's motion to suppress statements and quash arrest with available evidence he was illegally arrested in Indiana." Much of Degorski's argument attempts to relitigate the motion to suppress with evidence already in the record. For example, he argues that the officer's testimony is implausible, describing various portions of the hearing testimony as "patently incredible" or "bordering on absurd." But postconviction proceedings are not the place to relitigate issues that could have been or were raised on direct appeal. *E.g., People v. Allen*, 2015 IL 113135, ¶ 20. Degorski has litigated or has had the opportunity to litigate the credibility of the officers' suppression hearing testimony. We will not reweigh it now.

¶ 58     We will, instead, focus on the new evidence Degorski offers. In his postconviction petition, Degorski referred to his own testimony he could have offered to show that officers "refused to let him leave *** ordered him into a police vehicle and denied him the opportunity to grab any of his personal belongings," and that he did not subjectively believe he was free to leave. The petition then refers to another witness, Walter Hanger, who "saw Degorski searched and placed in a police car." The petition also mentions possible testimony from the Hamilton County Sheriff "that Palatine police told them that they were conducting an 'arrest' of Degorski." The last piece of evidence discussed in the petition is a "Call for Service sheet that clearly indicated that Hamilton County was informed that Palatine was issuing an 'arrest warrant' for Degorski."

-18-  A 41

No. 1-18-0192

¶ 59    This evidence does not substantial show ineffective assistance of counsel for several reasons. First, Degorski's appellate counsel has abandoned reliance on all of the evidence referenced in the petition, except for the "Call for Service sheet." *E.g. People v. Lewis*, 2017 IL App (1st) 150070, ¶ 9 (counsel abandons postconviction claims where claims are raised in petition but not reasserted on appeal). Second, even if most of the evidence were not abandoned on appeal, it is not adequately presented in the petition. For example, Degorski did not attach his own affidavit explaining what his testimony would have been at the motion to suppress. Similarly, there are no affidavits from Hanger or the Hamilton County Sheriff contradicting the testimony in the record. *Cf. People v. Coleman*, 2014 IL App (4th) 110463, ¶ 64 (affidavits not necessary only where petition is otherwise supported by record), *superseded on other grounds as stated in People v. Robinson*, 2020 IL 123849, ¶ 78 (Illinois Supreme Court Rule 1101 allows hearsay evidence in postconviction proceedings)).

¶ 60    Additionally, we cannot locate the "Call for Service sheet" in the record. The only pages appellate counsel cites in her brief referencing the exhibit purportedly containing the "Call for Service" are the pages in the petition where the sheet is mentioned. A word search of the common law record for "Exhibit G," which contains the "Call for Service sheet," reveals only a complaint for a search warrant of a residence and an excerpt of trial testimony.

¶ 61    Even if we could locate the "Call for Service sheet" and it contained the information counsel describes, it would not help Degorski's ineffective assistance claim. Degorski argues the "call sheet" would show "Palatine police's intent to *arrest*, not simply chat, with Degorski." (Emphasis in original). But the subjective beliefs of the officer (or Degorski for that matter) are not relevant to whether officers have seized a person in a constitutionally meaningful way. *E.g.,*

No. 1-18-0192

*In re Tyreke H.*, 2017 IL App (1st) 170406, ¶ 54 ("the officer's subjective motivation, and his or her reason for stopping a citizen *** are irrelevant to the question of whether a seizure occurred."). Because the evidence Degorski argues should have been presented would have been irrelevant to whether he was arrested in Indiana, he cannot show prejudice from counsel's failure to introduce that evidence at the hearing on the motion to suppress. See *People v. Henderson*, 2013 IL 114040, ¶ 15 (to show prejudice for errors in motion practice, defendant must show that "suppression motion is meritorious").

¶ 62 *Evidence that Officers Coerced Degorski's Statement*

¶ 63 Degorski next argues trial counsel was ineffective for failing to "call available witnesses to substantiate his claim that his oral, unrecorded confession was the product of police coercion." He points to two witnesses: (i) himself, and (ii) Jonathon Simonek, who allegedly experienced similar coercive interrogation tactics at the hands of police. We find Degorski failed to make a substantial showing of a constitutional violation because his claim about his own testimony is not supported by an affidavit and his claim about Simonek's testimony is both unsupported by an affidavit and irrelevant to the issue at the hearing on the motion to suppress.

¶ 64 A postconviction petitioner is not relieved of the burden of attaching affidavits or other supporting documentation to their petition simply by including a verification affidavit at the end of the petition. *Collins*, 202 Ill. 2d 49, 67-68 (2002). We can overlook certain deficiencies in affidavits or the failure to attach evidence in certain circumstances. See *Allen*, 2015 113135, ¶ 34 (excusing failure to notarize affidavit at first stage); *Collins*, 202 Ill. 2d at 67-68 (discussing *People v. Washington*, 38 Ill. 2d 445 (1967) (excusing failure to attach affidavit where absence explained), and *People v. Williams*, 47 Ill. 2d 1 (1970) (excusing failure to attach affidavit where only evidence

-20- A 43

No. 1-18-0192

other than petitioner's own affidavit was that of counsel)). We see no basis on which to excuse Degorski from providing his own affidavit, which would contain allegations within his knowledge; this is especially true where counsel represented him at the second stage who could have drafted the affidavit for him.

¶ 65   Degorski suggests his mother's affidavit can substitute for his own. We disagree. In his brief, Degorski says his mother's affidavit attests that he "wanted to testify" about the coercive environment he experienced during his interrogation. We do not read the affidavit that broadly. The affidavit explains that Degorski told his counsel "over and over that he wanted to testify," but counsel would not allow it and tried to get Degorski's mother to convince him not to testify. But the remaining substance of the affidavit has nothing to do with the suppression hearing and refers to information from Lockett's testimony that Degorski's mother believed to be untrue. The affidavit makes no mention of coercive interrogation tactics or Degorski's desire to testify about such tactics. In short, no evidence supports the allegations in the petition that officers coerced Degorski's confession.

¶ 66               *Claim that Defense Counsel Prevented Degorski's Testimony*

¶ 67   Degorski then claims his trial counsel was ineffective because he "prevented" Degorski from testifying on his own behalf. The affidavit of Degorski's mother attests that Degorski wanted to testify in his defense and that trial counsel would not let Degorski testify and enlisted his mother to help persuade him not to testify. Degorski's petition asserted that had Degorski testified, he would have (i) discredited Lockett's testimony that he confessed to her, (ii) testified that Bakalla's testimony was a lie, and (iii) testified that the police coerced a false confession from him. He reasons that the jury would have been presented with conflicting evidence and concludes there was

'a reasonable probability that the outcome would have been different if the jury had heard Degorski's testimony undermining the State's evidence."

¶ 68    Degorski's argument suffers from the same evidentiary deficiencies as many of his previous arguments: we cannot evaluate prejudice because he did not execute his own affidavit explaining what his trial testimony would have been had counsel called him to testify. His petition sets out some detail relating to his proposed testimony about his treatment at the hands of Palatine police. But as to his challenges to Lockett's and Bakalla's testimony, the petition is conclusory. For example, he says that he would testify that "Lockett's testimony claiming that he confessed to her [was] patently false" or that "Bakalla's testimony was equally false." Without elaboration in an affidavit, we cannot say Degorski made a substantial showing of prejudice from counsel's alleged interference with his right to testify.

¶ 69    An affidavit containing specific information would also be helpful in another regard: explaining why we should not credit Degorski's decision to waive, on the record, his right to testify. Generally, on-record admonishments about the right to testify rebut any claim that trial counsel was ineffective for preventing a defendant from testifying—even when considering an ineffectiveness claim through the lenient lens of first-stage proceedings. *People v. Knapp*, 2020 IL 124992, ¶¶ 52-54. Our supreme court appears to have left open the possibility of an exception where "defense counsel has just silenced the defendant." *Id.*, ¶¶ 55-57 (discussing *Hartsfield v. Dorethy*, 949 F.3d 307, 315 n.5 (7th Cir. 2020)). We acknowledge Degorski's petition alleges that "trial counsel was adamant that Mr. Degorski was not going to testify on his own behalf and communicated that sentiment to Mr. Degorski." Without an affidavit, however, we do not know the timing of those conversations or the details of those conversations.

¶ 70    It would be easy to forgive these omissions on first-stage review, where Degorski's claims need only have been arguable. At this stage, however, Degorski was assisted by counsel and must make a *substantial* showing of a constitutional violation. Even taking his allegations as true, there simply is not enough detail in the petition itself to make the required showing without additional information in an affidavit.

¶ 71            *Trial Counsel and Appellate Counsel Failed to Challenge DNA Evidence*

¶ 72    Degorski next argues trial counsel was ineffective for failing to move to exclude DNA evidence found on a chicken bone showing Luna was present at the time of the murders; he adds that appellate counsel was also ineffective for failing to raise the issue on direct appeal. He argues that Luna's DNA at the scene was irrelevant to his guilt or innocence and points to only one indicium of prejudice: "juries and courts alike find DNA evidence highly persuasive." We agree and have said so. *E.g., People v. Wright*, 2012 IL App (1st) 073106, ¶ 96 (describing "DNA match" as "highly persuasive" evidence). Degorski never draws the link between the persuasive nature of the evidence of Luna's presence at the scene of the murders and his own guilt. He, therefore, cannot show prejudice from trial counsel's failure to challenge the DNA evidence or appellate counsel's failure to raise the issue in his direct appeal.

¶ 73    We need not restate the standard governing ineffective assistance of counsel claims other than to add that ineffective assistance of appellate counsel claims are (i) governed by the same standard, and (ii) rise or fall on the merits of the underlying claim. See *e.g., People v. English*, 2013 IL 112890, ¶¶ 33-35. As with Degorski's previous claims, this turns on assessing prejudice from counsels' alleged errors.

¶ 74    In Degorski's petition, he claims to admit Luna's DNA evidence in his trial prejudiced him because "[t]here can be no bout that the jury improperly used that testimony to conclude that Luna

-28-    A 46

No. 1-18-0192

was guilty of the crime and that if Luna was guilty, Degorski must be guilty." The petition further reasons that the State's case hinged almost entirely on Luna's and Degorski's statements to Lockett and Bakalla, and so the DNA evidence bolstered their testimony as well.

¶ 75    Degorski's appellate counsel does not adopt these arguments in her brief, focusing exclusively on the prejudicial nature of DNA evidence more generally. As mentioned, we agree with that general proposition. We have cited studies describing the "mystical aura" surrounding DNA evidence to the point that "its mere introduction in a criminal case is sufficient to seriously impede defense challenges." *Wright*, 2012 IL App (1st) 073106, ¶ 96 (citing Joel D. Lieberman *et al.*, *Gold versus Platinum: Do Jurors Recognize the Superiority and Limitations of DNA Evidence Compared to Other Types of Evidence?*, 14 Psychol. Pub. Pol'y & L. 27, 33, 58 (2008)). But every case Degorski cites involves the prejudicial impact of DNA evidence directly implicating the defendant in the crime. *In re T.W.*, 402 Ill. App. 3d 981, 993 (2010); see also *People v. Safford*, 392 Ill. App. 3d 212, 216, 225-26 (making same point about fingerprint evidence showing defendant's presence at scene). Degorski does not explain how DNA evidence showing Luna was present at the time of the murders—powerful evidence though it may be—is prejudicial as to him. We find it particularly difficult to discern the prejudicial impact of the DNA evidence because, in Degorski's own words, "it was not contested that Luna was present at the scene."

¶ 76    Degorski cannot establish prejudice from trial counsel's failure to move to exclude Luna's DNA evidence. On appeal, he fails to draw any connection between the DNA evidence and his own guilt, and, even if he had, the evidence was cumulative of other trial evidence by his own admission. For the same reasons, we conclude that the outcome of Degorski's direct appeal would not have been different had appellate counsel raised the issue, and so he suffered no prejudice from appellate counsel's alleged deficiency either.

A 47

No. 1-18-0192

¶ 77    Our decision to affirm rests mainly on the heightened burden placed on Degorski at the second stage of postconviction proceedings. Though we construe the allegations in the petition liberally at this stage, to make a substantial showing of a constitutional violation, "the allegations in the petition must be supported by the record in the case *or by its accompanying affidavits*." *Coleman*, 183 Ill. 2d at 381. The only basis for excusing the affidavit requirement, especially at the second stage, is where "the allegations in the petition are based upon matters of record." *Id.* Each of Degorski's claims requires us to consider matters outside the record, and without factual details we cannot glean from the pleadings themselves, we cannot say Degorski made a substantial showing of a constitutional violation sufficient to warrant further proceedings under the Act.

¶ 78    Affirmed.

A 48

## JURAT WITH AFFIANT STATEMENT

State of ___Illinois___
County of ___McHenry___ } ss.

☒ See Attached Document (Notary to cross out lines 1–7 below)
☐ See Statement Below (Lines 1–7 to be completed only by document signer[s], *not* Notary)

2 _____
3 _____
4 _____
5 _____
6 _____
7 _____

_____
*Signature of Document Signer (Affiant) No. 1*

_____
*Signature of Document Signer (Affiant) No. 2 (if any)*

Subscribed and sworn to (or affirmed) before me

this __27__ day of __March__ , __2023__ , by
    *Date*        *Month*       *Year*

(1) ___Jennifer Peters___
          *Name of Signer No. 1*

(2) _____
          *Name of Signer No. 2 (if any)*

___EMancilla___
*Signature of Notary Public*

E MANCILLA
Official Seal
Notary Public - State of Illinois
My Commission Expires Jun 8, 2023

*Place Notary Seal/Stamp Above*

_____
*Any Other Required Information*
*(Residence, Expiration Date, etc.)*

— OPTIONAL —

*Not required by law, this information can be useful to those relying on the document and prevent fraud.*

**Further Description of Any Attached Document**

Title or Type of Document: ___Proof /Certificate of Service___

Document Date: ___03/27/2023___ Number of Pages: ___97___

Signer(s) Other Than Named Above: _____

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

James Degorski
Petitioner                              )

                                        )       Case Number:

Reg. No. M09414                         )       _____
                                                (Supplied by Clerk of this Court)
        VS.                             )

Charles Truitt                          )
REPONDent

## PROOF/ CERTIFICATE OF SERVICE

TO: Clerk of the United States
District Court for Northern District
Prisoner correspondent
219 South Dearborn Street
Chicago, IL 60604

TO: Attorney General
Kwame Raoul
100 W. Randolph St.
Chicago, IL 60601

TO: Prosecutor Kimberly M. Foxx
308 Richard J. Daley Center
Chicago, IL 60602

**PLEASE TAKE NOTICE that on March 16, 2023, I have placed the documents listed below in the mail properly addressed to the parties listed above for mailing through the United States Postal Service: James Degorski's Writ of Habeas Corpus.**

Pursuant to 28 USC 1746, 18 USC 1621 or 735ilcs 5/1-109, I declare, under the penalty of perjury, that I am a named party in the above action, that I have read the above documents, and that the information contain therein is true and correct to the best of my knowledge.

Date: 3-27-23

/s/ _____

**NAME   Jennifer Peters**

**5403 Cobblers Crossing**

**McHenry, IL 60050**

1

# UNITED STATES POSTAL SERVICE®

## PRIORITY MAIL EXPRESS™

**MAILING ENVELOPE**
FOR DOMESTIC AND INTERNATIONAL USE

PS10000132900

EP13C July 2022
OD: 15 x 11.625



USPS.COM/PICKUP

To schedule free Package Pickup,
scan the QR code.

**PEEL FROM THIS CORNER**

03/29/2023-5

**RECEIVED**

MAR 2 2023

THOMAS G. BRUTON
CLERK U.S. DISTRICT COURT

**SCREENED**
MAR 6 2032
US MARSHALS



---

### UNITED STATES POSTAL SERVICE®

**PRIORITY MAIL EXPRESS®**

**CUSTOMER USE ONLY**

PHONE ( 703 ) 231-6689

FROM: (PLEASE PRINT)
Jennifer Petters
5403 Cobblers Knob
McHenry, IL 60050

**DELIVERY OPTIONS** (Customer Use Only)

☐ SIGNATURE REQUIRED (Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)                    PHONE ( )
Clerk of the Court
U.S. District Court
Evame Congress and Jury
219 South Dearborn St.
Chicago, IL
60604

---

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No.
Federal Agency Acct. No. or Postal Service™ Acct. No.

EI 578 684 995 US

U.S. POSTAGE PAID
PME
McHenry, IL
MAR 27, 23
AMOUNT
**$30.65**
R2304E105757-1

**ORIGIN POSTAL SERVICE USE ONLY**

PO ZIP Code: 60050

Day Accepted (MM/DD/YY): 3/28/23

Scheduled Delivery Date (MM/DD/YY): 3/28/23

Time Accepted: 12:15 ☐ AM ☒ PM

Scheduled Delivery Time: ☒ 10:30 AM ☐ 3:00 PM

Postage: $ 30.65

COD Fee / Insurance Fee: $

Total Postage & Fees: $ 30.65

Weight: 1 lb 2 oz ☐ Flat Rate

Acceptance Employee Initials:

Delivery Attempt (MM/DD/YY)    Time    ☐ AM ☐ PM    Employee Signature

Delivery Attempt (MM/DD/YY)    Time    ☐ AM ☐ PM    Employee Signature

LABEL 11-B, MAY 2021    PSN 7690-02-000-9996




---







### UNITED STATES POSTAL SERVICE®

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13C © U.S. Postal Service; July 2022; All rights reserved.

**DuPont™ Tyvek®**
Protect What's Inside.™